RALPH METCALFE,

*Plaintiff and Respondent,*

vs.

JOHN H. WINCHESTER, Jr.,

*Defendant and Appellant.*

(No. 2608; October 27th, 1953; 262 Pac. (2d) 404).

For the defendant and appellant the cause was submitted upon the brief and also oral argument of Burt Griggs of Buffalo, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief and also oral argument of Robert H. McPhillamey of Buffalo, Wyoming.

144

## OPINION

RINER, Justice:

This is a direct appeal proceeding brought by John H. Winchester, Jr., as appellant who was the defendant in the District Court of Johnson County, to have this court review a judgment of that court in favor of Ralph Metcalfe who was the plaintiff there and is the respondent here. The action was one brought by the plaintiff aforesaid to recover an amount claimed to be due for certain plowing performed on the land of the defendant. Most of plaintiff's petition is in the usual form in a pleading, quantum meruit. The allegations preceding those drawn in quantum meruit form are verbatim as follows:

"1. That on or about the 23rd day of September, 1947, the defendant agreed with the plaintiff to lease to the

plaintiff a certain tract of land, situated in Johnson County, Wyoming, and described as follows, to-wit:

Section 35, Township 49 North, Range 81 West of the 6th P.M. Johnson County, Wyoming.

"2. That on or about the same date the defendant orally agreed to include said described premises in a written lease agreement theretofore executed by the plaintiff and defendant on the 23rd day of September, 1947,"

These averments are supplemented by the statements set out in paragraph "5" as follows:

"5. That from the 23rd day of September, 1947, to the 18th day of May, 1948, the plaintiff often requested the defendant to have the above-described premises included in the written lease as agreed, but though often requested the defendant refused and declined to do so, whereupon the plaintiff ceased to farm the said land, and ever since the 18th day of May, 1948, the defendant has refused to execute a written lease, or to include said land in the aforementioned executed lease agreement of the 23rd of September, 1947."

The first cause of action in plaintiff's petition is substantially outlined as above. Plaintiff's second cause of action need not be described, particularly as it was for a small amount of money and the court gave judgment in favor of plaintiff only for the amount the defendant admitted he owed plaintiff as set out in his answer to plaintiff's alleged second cause of action, viz.: $9.18.

The controversy on this appeal is based in large measure upon the claim made in plaintiff's first cause of action.

Defendant's answer to plaintiff's first cause of action admits that plaintiff plowed certain of defendant's land in Section 35 and admits that he orally leased to plaintiff the land aforesaid and:

"* * * for the purpose of seeding said lands to flax in

the Spring of 1948 and for reseeding the same lands to winter wheat in the fall of 1948; with the understanding that the term would end upon the harvesting of the said Fall wheat crop in the year 1949 and Defendant denies each and every other allegation contained in said first cause of action."

Included in defendant's answer was a counterclaim which in substance alleged that in the Spring of 1948 plaintiff and defendant orally agreed that plaintiff should plow and seed to flax not less than 300 acres of defendant's land in sections 27 and 35 in Township 49 North, Range 81 West of the 6th P.M.; that by said oral agreement plaintiff was to furnish all the seed and perform all the labor for such operations and to receive two-thirds of the crop of flax to be grown thereon and defendant was to receive one-third thereof; that plaintiff took possession and plowed 121.1 acres of land under said agreement but plaintiff for reasons unknown to the defendant refused to seed said ground and raise any crop thereon and demanded payment of the defendant for plowing said ground; that by reason of plaintiff's failure to seed and harvest the crop on said premises defendant received no income from said land during the year 1948 and nothing for the use of said land; that if plaintiff had farmed the 300 acres as he agreed the land would have produced a crop of flax of not less than 5 bushels per acre, a total of 1500 bushels, of which defendant would have owned 500 bushels; that said flax was of the reasonable and market value of $5.00 per bushel; that by reason of plaintiff's failure to farm the entire contracted acreage and to seed any of it defendant has been damaged in the sum of $2,500, no part of which has been paid.

It was prayed that plaintiff's petition be dismissed at plaintiff's cost and that defendant have and recover of plaintiff judgment in the sum of $2,500 and costs.

Plaintiff filed his reply to defendant's pleading in which he denied all of the allegations of defendant's answer except as they admitted the allegations of plaintiff's petition. As a further reply plaintiff alleged that defendant failed and refused to lease to plaintiff the land described in plaintiff's petition and failed to execute a written contract as agreed.

That plaintiff agreed to lease said land upon "the same terms and conditions as those contained in a prior executed lease agreement of date, September 23rd, 1947," the term of which should extend from September 23rd, 1947, to the completion of the harvest in the year 1950.

Replying to defendant's counterclaim plaintiff alleged that on September 23rd, 1947, plaintiff and defendant entered into an oral agreement whereby they agreed to execute a written lease by which plaintiff was to plow and seed to flax an unstated number of acres on defendant's land in Section 35 of Township 49 North, Range 81 West of the 6th P.M.; that according to that oral agreement plaintiff was to furnish all of the seed and perform all labor for such operations and was to receive two-thirds of any crops grown thereon; the defendant to receive one-third thereof; that relying on defendant's promise to execute a written lease plaintiff entered said premises and plowed 121.1 acres of land constituting all the available land in Section 35, the remainder being leased to other persons; that due to defendant's failure to execute a written lease plaintiff ceased further operations upon said land, all known to defendant and all of which plaintiff often informed defendant. All other allegations of the counterclaim of the defendant are denied.

For a further defense to said counterclaim plaintiff alleged that plaintiff was at all times ready to execute

a written lease but defendant failed and refused to execute it although he was often requested to execute such written agreement as orally agreed; that Section 27 of Township 49 North, Range 81 West of the 6th P.M., is included in a written agreement between said parties of date, September 23rd, 1947, and is governed by its terms; that defendant requested plaintiff not to plow and seed the land in said Section 27 because the weather was too dry and the defendant desired the land as pasture for defendant's sheep. It was prayed that defendant take nothing by his counterclaim and that plaintiff have judgment against the defendant as asked in "the complaint."

The cause was tried to the court without a jury resulting in a judgment upon plaintiff's first cause of action for the full amount sued for, viz.: $1508. This amount was calculated according to plaintiff's petition as follows: 146 hours work with a large tractor for which a charge was made of $10.00 per hour, or $1460, and 12 hours work with a small tractor for which a charge was made of $4.00 per hour or $48.00.

The plaintiff himself testified that 146 hours were worked with the large tractor and 12 hours with the smaller tractor. He also says that two men, Andy Calvetti and Hubert Pease, did the plowing and that he, himself, (Metcalfe) did the 12 hours plowing. Calvetti was not called as a witness. Pease was called and he testified that he was engaged in plowing on the land of Mr. Winchester. He stated he does not exactly remember when he did the plowing or how many days and nights he put in doing that work, but he stated he put in about 140 hours work and that he and Mr. Calvetti alternated doing the work. Pease does not say he was working on Section 35. He also states that while he remembers he worked on the plowing he does not "remember for sure" whether it was disk plowing. He

thereafter further stated he guesses it was disked. When it is remembered that in this connection, as shown infra, plaintiff testified that 170 acres were plowed when, as a matter of fact, only 121.1 acres (as shown by actual survey of the amount of land which was plowed), the uncertainties of plaintiff's claims for the reasonable value of work done on Section 35 aforesaid is clearly apparent.

On plaintiff's second cause of action the judgment was, as stated above, for $9.18, the amount admitted to be due plaintiff from defendant as set out in defendant's answer. The judgment also dismissed defendant's counterclaim and allowed costs to the plaintiff. The judgment preceding the decretal clauses described above found generally in favor of the plaintiff on all the issues involved.

Under the situation thus presented in the case we must be guided by what this court has previously said in Willis vs. Willis, 48 Wyo. 403, 429; 49 P. (2d) 670, to this effect:

"* * * the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party *in conflict therewith,* and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." (Italics supplied.)

See also cases cited in Jacoby vs. The Town of the City of Gillette, 62 Wyo. 487, 494; 174 P. (2d) 505, where the ruling in the Willis case was definitely followed.

It appears from the record that on September 23rd, 1947, the parties, Winchester and Metcalfe, entered into a written agreement whereby plaintiff was to have a lease on defendant's land in Section 1; Township 48,

North, Range 81 West of the 6th P.M., and also on his lands situate in Sections 27 and 34 Township 49 North, Range 81 West of the 6th P.M. The lease term was fixed at three years from September 23rd, 1947. It was agreed that defendant should receive as rent for his land:

"⅓d of all grain and ⅓d of all flax either in bin at ranch or in elevator or cars at Buffalo at option of first party. Party of second part agreed to fall plow and seed to winter wheat approximately 1100 acres of wheat stubble and approximately 500 acres of new land to be planted this fall, weather permitting, any balance to be planted in Spring of 1948."

It was agreed also that:

"Work to start immediately. Plaintiff to furnish all seed, harvesting, growing and hauling of said crops at his expense."

In addition to these lands described in the written agreement of lease defendant was the owner of about 300 acres of tillable lands in Section 35 Township 49 North, Range 81 West of the 6th P.M. which on September 23rd, 1947, had not been contractedto any person whomsoever.

There is no showing in the record why the lands in Section 35 aforesaid were not included when the written lease was executed.

Plaintiff testified that shortly after the lease was signed he suggested that the land in Section 35 aforesaid should be included but defendant, according to plaintiff's testimony, said: "Yes, but Mr. Winchester said, 'We'll just let it go a little while and we'll put it in later.' " The plaintiff thereupon commenced work under the written contract above described. The land in Section 35 was never included in the lease contract although the plaintiff testified that the defendant was

asked by the plaintiff several times to insert this section of land in the three-year lease.

Nothing was done on Section 35 until the 8th of May, 1948, when plaintiff went upon the land and plowed until and including May 18th. Then, as he says, the plaintiff went to the defendant and told him that he would not seed the plowed land "unless he, (the defendant), would include the land in Section 35 in the written contract." Plaintiff refused to "do any work after this plowing was completed." The chief fault found by plaintiff as concerns the defendant was that the latter declined to insert the Section 35 of his land in the written agreement of lease. Why he was unwilling to do so can only be surmised from the defendant's testimony that:

" 'Well,' I says to him, 'it seems as though you have as much as you can take care of, or more, already.' "

Also from plaintiff's testimony as he told his counsel on direct examination:. "Q. How were your relations between you and Mr. Winchester at that time? A. Well, they became somewhat strained. We had some difficulties over methods of farming and various things of that nature." The words "at that time" in the foregoing question referred to what appears in the transcript preceding, as follows: "Q. After you had completed the plowing and preparing the seed bed, did you request that the lands in Section 35 be inserted in the written contract? A. Yes I did. Q. Did Mr. Winchester do that? A. No, he simply refused to do so at that time."

The following testimony is quoted verbatim from the record as throwing considerable light on plaintiff's conduct in performing the plowing work at the time it was done: "Q. Mr. Metcalfe, when should a crop of flax be seeded if you expect to get a crop? A. Well, I

would say that it should be put in about the first of May." Plaintiff also testified: "Q. You knew when you started to work in May, 1948, that you did not have the contract? A. Yes, I did. Q. And nevertheless, you went ahead and plowed it? A. Yes. Q. Now, if this original agreement had been made and this land had been included in the contract, as you allege, what were your obligations? What did you have to do? A. I would have had to go ahead and seed it to crop. Q. What was the crop that you were to seed that spring? A. Well, I believe it was flax. Q. You were to seed the crop to flax and you also then had the obligation to harvest the crop in the fall? A. That's correct. Q. And your profit on that matter—if there was a profit—would have been two-thirds of the crop? A. Well, my gross earnings, gross income, from it would have been, yes sir, two-thirds of the crop. Q. In other words, this contract was upon a share basis; if it had been made it would have been upon a share basis in which you would have received two-thirds of the crop? A. That's right. Q. Mr. Winchester received one-third? A. Yes. Q. Then you went ahead and plowed all the land you say was available in Section 35? A. Yes. Q. When did you complete that plowing. A. I don't remember the exact date it would be. Q. Well, your petition here alleges that the work was completed May 18th, is that correct? A. Well, I believe it is. Q. In other words, you plowed from May 8th until May 18th, both days inclusive, which would have made 11 days?" Also: "In other words, in order to make a crop for the growing season, the seed bed should have been completed and the seed in it at least by the first of June? A. Yes. Q. And if this contract had been made that was your obligation to do that, wasn't it? A. That's correct. Q. Did you seed that crop? A. No, I didn't. Q. Did you do anything with that land after you left it on May 18th? A. No. I finished completing the seed bed and that's

as far as I went with it. Q. I see. They why did you then not put in this seed. Why didn't you seed it? A. Because I just couldn't get Mr. Winchester to make that contract as agreed. Q. Well, you knew on May 8, 1948, that you had no such contract didn't you? A. Yes, I did. Q. You went ahead and worked 11 days. Now, what occurred during that 11 days that decided you not to put in that seed bed? A. Just the simple fact that we couldn't get that contract made as agreed. Q. But you were in no different condition or situation on May 18th so far as the contract was concerned than you were on May 8th, isn't that true? A. Except that Mr. Winchester had failed to keep his agreement. Q. Well, he had failed to keep it up to May 8th also, hadn't he? A. I guess that's correct. Q. So that, as a matter of fact, your condition on this contract was no different on May 18th than what it was on May 8th, when you started work? A. Well, I'm just not sure about how that should be answered. Q. All right, we'll let that go at that. You knew on May 8th that you had no contract and yet you went in and started work on that land ostensibly to put in and raise a crop, is that true? A. That's right. Q. Well, why did you go ahead at all on May 8th if you had no contract? A. Well, at that time I had confidence in Mr. Winchester's word that he would include that in the contract. Q. And on May 18th you did not have any such confidence? A. No, about that time he had refused to do it after being requested several times." Plaintiff additionally testified: "Q. Had you notified Mr. Winchester that you were not going to see that land? A. I told him that I just wouldn't put it in unless he would include that in the contract. Q. And when did you tell him that? A. Immediately after the plowing was finished. Q. And you told him that you were not going to seed it? A. Yes. Q. Did you tell him that he could take advantage of that plowing that you had done an dseed it himself?

Did you say anything about that or did you make any such offer to him? A. Would you please restate the question . . . No, I didn't." On June 8, 1948, plaintiff wrote a letter to the defendant which was received by the latter on June 14, following, as shown by U. S. Registered Letter Receipt offered in evidence by the plaintiff himself. In that connection plaintiff stated: "Q. Now, on June 8, 1948, it was too late in the season to plant a crop, wasn't it? A. That's correct. Q. You don't know, of course, when this letter was received by Mr. Winchester? A. No. I don't. Q. Now, I will ask you whether you used this language in this letter: 'I realize that it is too late for any kind of crop for this season, but if you still want to live up to your agreement, I will put it in wheat this fall. I am sure that it will be in excellent condition for fall wheat.' That's part of this letter, isn't it? A. I believe it was. Q. But your agreement with Mr. Winchester would have contemplated placing it in flax in the spring, wouldn't it? A. That's right."

As to whether the defendant received any benefit from plaintiff's plowing plaintiff stated: "Q. Do you know whether Mr. Winchester received any benefit whatever from this plowing. A. Yes, I do. Q. In what way? A. Well, I'm pretty sure that he put it in crop. Q. Do you know? A. Yes, I do. Q. When did he put it in crop? A. I believe in the fall of '48. Q. As a matter of fact part of that land was put in crop but it had to be replowed, didn't you know that? A. No. Q. You are not sure of that? A. No, I didn't know that. Q. If you had put that land in flax in the spring of 1948, the period that the land was being plowed or shortly thereafter, it would have been in time to have made a crop wouldn't it? A. Not a good crop. Q. Not a good crop; but there would have been some recovery on it, wouldn't there, so far as you are concerned? A. Well, we pos-

sibly— Q. Well, what effort, if any, did you make to save it, this plowing that had been done? A. I tried to work out this agreement with Mr. Winchester. Q. And that's all that you did? A. So that the work could be continued. Q. Yes, but that's all you did. You didn't do anything toward sowing or plowing or seeding or anything whereby you might have escaped a loss of sale by reason of that plowing? A. No, I refused to do any work after this plowing was completed."

Yet, it is reasonably clear that when plaintiff commenced plowing on the 8th day of May, 1948, he knew that not only did he not have a written contract authorizing him to do the work but also that plowing done at that time was seriously impaired in value so far as it could be regarded as useful to the defendant in obtaining the most worthwhile use of his land for a crop of flax; however, plaintiff nevertheless continued the work and did not finish as we have seen until eleven days later when the likelihood of securing a crop had depreciated still more.

In Kelley v. Hance, 108 Conn. 186, 142 Atl. 683, 684, the Court stated:

"Where one retains goods received in part performance of a contract, a promise to pay for them is ordinarily implied since he has the option either to pay for or return them. Where, however, work has been done upon one's land, the benefit cannot well be returned and an acceptance of the benefit cannot be implied from the mere retention of possession of the land. In such cases, therefore, the better rule would seem to be that, except where there has been an actual acceptance of the work prior to its abandonment by the plaintiff, mere inaction on the part of the defendant will not be treated as an acceptance of the work from which a promise to pay for it may be implied. Sumpter v. Hedges, (1898) 1 Q.B. 673; Elliott v. Caldwell, 43 Minn. 357, 45 N.W. 845, 9 L.R.A. 52; 6 Page on Contracts; § 3269, 9 C.J., 819."

58 Am. Jur. 557, § 57 asserts that:

"Under the common counts of indebitatus, assumpsit, and quantum meruit, the quality as well as the quantity of service for which recovery is sought is a part of plaintiff's case, and defendant may, under a denial, without claiming recoupment, show that, because of the plaintiff's lack of skill or care, the service was worth little or nothing."

As to the amount of plowing that plaintiff had done after describing the equipment, he stated to his counsel: "Q. And you recall approximately how many acres of land it plowed? A. Well, there was approximately 100 acres that was moldboard plowed with a moldboard type of plow. Q. Was there any other plowing done? A. There was 70 acres that was plowed with what's known as an offset disc machine."

Defendant further testified that he had had the land that was plowed duly surveyed and the survey showed 121.1 acres only had been plowed. On cross-examination the defendant stated: "Q. You say the land had been surveyed? A. What land do you have reference to? Q. That was plowed. A. Yes, sir. Q. Who surveyed it? A. Frank Gatchell of Buffalo. Q. Do you have a map of that land. A. One is available."

The plaintiff was asked by his counsel whether he considered $4.00 an acre for plowing (this sum being the amount the defendant had offered to pay plaintiff thereafter by letter written under date of June 2nd, 1948, when there was very little, if any, time left for the defendant to seed the land and not lose altogether the benefit of the plowing work) was reasonable. Plaintiff's answer was: "Not for that type of plowing"; plaintiff was then immediately asked by his counsel: "Q. Well, what would be a reasonable figure by the acre? A. Well, I'd say $5.00 or $6.00 an acre, but not that deep, not that depth. But a normal breaking of

sod, $5.00 or $6.00 an acre would be a reasonable price." There was no proof supplied by the plaintiff as to what the plowing was reasonably worth per acre assuming it was plowed to a greater depth than called for by the written lease which was six inches for stubble plowing and five inches for new land. Obviously the burden was upon the plaintiff to show what the additional depth was worth. This he did not do. It would appear also that plaintiff having plowed 121.1 acres as shown by actual survey and not 170 acres as he claimed—he should receive not more than $605.00.

Considering this case from an equitable viewpoint, when plaintiff began plowing on May 8, 1948, he knew that the defendant must have understood that the work done on that day and thereafter was being done merely as a preliminary operation to plaintiff's going on and seeding the land harvesting a crop of flax. Recalling the arrangements made between the parties in the written contract of lease for the production on that land of a crop of flax, it is altogether unreasonable to believe that even if, as plaintiff testifies, the defendant told him to go ahead and plow the land in Section 35 aforesaid, it was with the understanding that plaintiff should immediately after the plowing was completed refuse to seed a crop and thereafter harvest it, unless defendant would insert the agreement as to Section 35 as a part of the written lease aforesaid. Plaintiff knew that even when he started to plow on the 8th of May, 1948, it would be impossible to raise a good crop of flax and that when he finished plowing that there was even less likelihood of a worthwhile crop being obtained. We cannot think otherwise than if defendant had known what plaintiff had intended to do, viz. quit work on the land after he had only plowed it, the defendant would ever have authorized, assuming he did so, the plowing to be done and there would have been, consequently,

no lawsuit. Plaintiff knew all the time he was working and when the work was concluded that defendant had in effect repeatedly declined to insert Section 35 in the written lease contract. So far as the record shows, that situation had not changed at any time during the month of May, 1948, and we can see nothing in this record which would lead plaintiff to think it had changed.

The record discloses that defendant offered certain photographs in evidence with this preliminary foundation as to their admissibility: "Q. Mr. Winchester, I hand you a picture marked Defendant's Exhibit 'C' for identification and ask you who took that picture? A. I did. Q. And when was that taken? A. That was taken in August, late August. Q. Of - - -? A. 1948. Q. And what does that picture represent? A. It represents the enormous growth of Russian thistles, or tumble weeds. Q. Where? A. On the ground; that was on the ground that he had plowed. Q. And does it correctly represent the condition of the Russian thistles on that part shown in the picture? A. Yes, sir."

Plaintiff objected to their introduction on the grounds that: "it wasn't clearly shown that this was taken on Section 35; it was not taken at the time that the plowing was done it was several months later; and further, on the grounds that there has been no testimony as to the type of camera or any other thing that qualifies this man as an expert photographer." The Court sustained the objection. This ruling, we think, was prejudicial and reversible error. In Cady vs. Department of Labor & Industries, 23 Wash. (2d) 857, 162 P. (2d) 813, 819, the Supreme Court of Washington said:

"This court has heretofore said that the practice of admitting photographs is to be encouraged as an aid to the comprehension of physical facts, because such

evidence usually clarifies some issue and gives the jury and the court, a clearer comprehension of the physical facts than can be obtained from the testimony of witnesses. Kelly v. City of Spokane, 83 Wash. 55, 145 P. 57.

"We have also held it to be reversible error to exclude a photograph which gives a fair representation of physical conditions material to the issues involved. Washington v. City of Seattle, 170 Wash. 371, 16 P. 2d 597, 86 A.L.R. 113."

Scott on Photographic Evidence states in Section 602, pp. 483 and 484 that:

"Ordinarily a photograph is competent evidence of anything of which it is competent for a witness to describe verbally. Their admissibility does not depend upon whether the objects they portray can be described in words but on whether it would be useful to permit the witness to make his description clearer by using the photographs."

Also in Section 603, page 484, it is further stated that:

"* * * before a photograph is admitted in evidence there must always be preliminary proof that it is a correct representation of its subject."

And 32 C.J.S. § 715, pp. 623 and 624 indicates that: "The photograph may be verified by oath of the photographer who took it, and, indeed, it has been said that this is the better practice. However, it is not necessary to produce the photographer; sufficient verification may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the photograph fairly represents what it purports to represent."

As we have seen the accuracy of these photographs offered in evidence in the case at bar was vouched for by the defendant who himself took them. It was shown by defendant's testimony that they were taken on the plowed land in Section 35 aforesaid in August of 1948,

after the Spring plowing of the plaintiff had been abandoned by him. They were material and relevant to defendant's claim that the Spring plowing was of no benefit to him, but on the contrary, was a detriment because before he could make use of it for fall seeding of wheat in September 1948, he had to have the land replowed. His testimony was undisputed that this replowing was done. These photographs would have disclosed more accurately than words the true condition of the Spring plowing when it was desired to seed said land in the fall with winter wheat. It should be noted that the type of camera used or the fact that the defendant was an expert photographer as urged in the objection sustained by the Court, are really of no merit. The pertinent question was, did the photographs show *accurately* the condition of the ground at the time they were taken? That was proved by the uncontroverted testimony of the defendant.

We conclude, therefore, in view of plaintiff's wilful conduct in refusing to seed and harvest the crop of flax on Section 35 aforesaid that the judgment below should be reduced from $1508 to $605. If plaintiff is unwilling to accept this reduction, the judgment will be reversed and the cause remanded for a new trial.

*Judgment modified. New trial ordered if modification not accepted.*

BLUME, C.J., and HARNSBERGER, J., concur.