William MURDOCK, Appellant (Defendant below),

v.

STATE of Wyoming, Appellee (Plaintiff below).

No. 2907.

Supreme Court of Wyoming.

May 2, 1960.

Moran, Hettinger & Leedy, Riverton, for appellant.

Norman B. Gray, Atty. Gen., and W. M. Haight, Asst. Atty. Gen., for appellee.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

William Murdock and his wife Jean were charged in three counts with: the taking (under a theft of animals statute) of 67 ewes and 63 lambs belonging to Ben Iturrian, grand larceny of the said ewes and lambs, and altering and defacing the brands of 24 of the ewes and 22 of the lambs. The wife moved for a separate trial, and when the motion was granted, the case proceeded

against Murdock. Prior to the submission of the case to the jury, the State voluntarily dismissed the theft of animals count. The jury found the defendant guilty of larceny of the sheep but not guilty of altering and defacing the brands.[1]

As grounds for the appeal, it is urged that the evidence was insufficient to support the verdict, there was prejudicial error in the rulings regarding evidentiary matters, the trial judge was guilty of misconduct which prejudiced the defendant, and there was improper instruction of the jury.

The facts developed at the trial showed that the Murdocks were partners and ran their sheep in an area adjacent to those of Iturrian, several of whose sheep were found in the Murdock flock. Defendant insists that the Murdock sheep and those of Iturrian were inadvertently commingled while the two bands were close together, that he was not then present, but that he later returned and with his wife was making an effort to separate the sheep when the officers arrived.

The State's theory is that Jean Murdock in accordance with her husband's previously stated intention of stealing Iturrian sheep had taken the animals and that the Murdocks had retained them for several days with their own sheep, altering and defacing the brands on several of the animals.

We review the testimony of the witnesses in order to ascertain the merit of defendant's charge that the evidence was insufficient to sustain the verdict as to the larceny.

In early 1958 the Murdocks decided to go into the sheep business and employed an elderly man, Frank Harris, to assist in caring for their sheep. Harris testified that defendant on ten or fifteen occasions had said that he was going to build up his herd to eight or nine hundred "off of Iturrian and Gerrard." About the first of May the Murdocks and Harris after shear-

1. The court instructed the jury, "If * * you should find the defendant guilty as to the first charge [larceny], you are to give no consideration to the second charge [altering or defacing brands]."

ing began to trail the sheep to the summer range in the vicinity of the old Kindt homestead. Both Mr. and Mrs. Murdock were called out of the State by illness, and during their absence of approximately ten days, the sheep on the trail were tended by Harris and some relatives of the defendant. About the middle of June, Harris quit, apparently on account of illness, and Jean Murdock took charge of the sheep. On Wednesday, June 25, Leon Iturrian, the fourteen-year-old son of Ben Iturrian, was in charge of his father's sheep on the Sweetwater near the Kindt homestead. His sheep had gone around a hill out of sight, and as he came to turn back the leaders, he saw Jean Murdock on horseback apparently pushing some stragglers of her flock back into her main bunch. Afterward he counted his markers and when they were short told his father who the next day, Thursday, June 26, made a count. When Ben Iturrian found that there were 152 head missing, he went to look for them, and about noon drove to the Kindt homestead, parked his jeep, and walked close enough to see that some of his well-branded sheep were with those of the Murdocks in the meadow. He testified, "I could see naked eye good enough but I could see better with the field glasses." Later that day, he went back to his home in Riverton. (There is no definite statement regarding Iturrian's activities on Friday, June 27, except a reference to his seeing Jean Murdock.) On the morning of Saturday, June 28, Iturrian took a saddle horse and went to a rock pile about 500 yards from where the sheep were near the Kindt cabin and watched from about 5 a. m. until 7:30 a. m. He saw the Murdocks with a dog pushing the sheep, but they didn't have a corral to work with. About 7:30 a. m. the sheep were turned out, and those belonging to Iturrian started toward his camp. Murdock on a horse went to turn them back. The following morning, Sunday, June 29, Iturrian again went out to the same rock pile on a saddle horse at about five o'clock and saw the Murdocks working the sheep in a sort of corral against the building. With the aid of field glasses, he observed 72 head of his own sheep, some with brands clipped, some of them with blood on their ears where the ear tags had been and one large lamb with its tail cut. At that time he saw Murdock with a pair of sheep shears. That evening, Iturrian went to the sheriff's office and made some report of the matter. On Monday morning, June 30, he with Alfred Kealear, deputy sheriff and brand inspector, and William Logan, the undersheriff, went to the Kindt homestead, arriving there about eight o'clock. Both officers as they came in sight of the Murdocks' camp saw defendant standing in the chute, bending over. Defendant then walked around the barn and came up to talk to them. Logan told defendant he had a warrant for him, and the defendant said, "Bennie, some of your sheep are mixed up with mine." At defendant's invitation they went into his trailer for coffee, and when they returned to the corral found a ewe and a lamb in the squeeze chute. The animals bore Iturrian's brand, a green mitten, but the ewe had the upper portion of the brand clipped off, and some clipped wool was found nearby. Logan said, "Willie, this looks bad, all these sheep in your possession and these brands worked over," and according to Logan defendant replied, "'I didn't do it. It must have been the herder I had.'"

Mrs. Murdock and Iturrian went for materials to build additional corrals; and the officers, Iturrian, and the Murdocks worked with the sheep—Iturrian doing the actual separating at the chute gate. There were 68 ewes and 63 lambs that belonged in Iturrian's herd; 24 ewes and 22 lambs had the brands clipped slickly. The officers later made some further count of the Iturrian sheep and took pictures of certain of these.

Defendant was sworn and testifying in his own behalf positively denied that he had ever told Harris he was going to steal sheep from Iturrian and Gerrard. He said at the time of the mixing of the Iturrian sheep with those of the Murdocks he was some distance away haying at his brother-

in-law's ranch and knew nothing regarding the incident until his wife Jean told him; that he had then gone out to the Kindt homestead; that he and his wife tried to work the Iturrian sheep out of theirs; that they had continued to work at this without much success until Monday morning, June 30, when Iturrian and the officers came; that Iturrian said he had come after his sheep and Murdock responded, "It's just about time." Defendant positively denied that he had had any shears, that he had clipped any brands, or that he intended to steal any sheep. He said that he was not bending over the chute when the officers came, that he had gone out after breakfast to get his horse, had walked behind the barn, and was crossing the fence.

Defendant's counsel concede that the verdict cannot be disturbed if there is any substantial evidence upon which it can be based[2] and that evidence improperly admitted is not ground for reversal unless there is actual prejudice to the defendant. They insist however that there is no evidence to support the jury's verdict finding defendant guilty of larceny. In so arguing it is said, and we think correctly, that to support the conviction there must be a definite showing that defendant performed some act of taking, an asportation, or that he caused or procured Jean Murdock to perform such act; and that he must have done so with the intent to steal. It is urged that Jean Murdock attempted to avoid a mix-up of the sheep; that the defendant did not know that the sheep were together until told by his wife; and that they then made a sincere effort to separate the animals. Counsel go on to discuss the reliance which the State places on the clipping, admit that it is reasonable to believe that there was some irregularity regarding the brands, but challenge that the evidence showed defendant to have done the clipping, and say that, even were it assumed that he did, this fact would not furnish any support for the larceny verdict.

The State, conceding that asportation is essential to a conviction for larceny, urges that the least removal of a thing with the intent to steal it is sufficient even though the article is not taken away. Scott v. Harbor, 18 Cal. 704; State v. Gray, 106 N.C. 734, 11 S.E. 422; Annotation, 19 A.L.R. 724; 32 Am.Jur. Larceny § 17.

An analysis of the argument by defendant's counsel shows that undue emphasis is placed upon the testimony of defendant. It is true that if the jury had believed the testimony of William Murdock, to the exclusion of other evidence submitted, the inevitable conclusion would have been that there had been an inadvertent commingling of the sheep by Jean Murdock without defendant's knowledge and an honest effort thereafter by defendant to separate the sheep and return the strays to the rightful owner. However, there was other evidence which was inconsistent with this viewpoint: the testimony of the herder Harris that defendant had indicated his intent to steal Iturrian sheep; the testimony of Iturrian that he observed his sheep well branded with his own marks in the Murdocks' herd, certain of them being worked by the Murdocks, and later saw the brands clipped on some of them; and the testimony of the officers that they saw defendant bent over in the chute where they later found a sheep with Iturrian's brand partly clipped off. The jury was entitled to determine the credibility of the witnesses. State v. Faulkner, 75 Wyo. 104, 292 P.2d 1045; State v. Weekley, 40 Wyo. 162, 275 P. 122, 64 A.L.R. 420. Certain of the evidence in this case is circumstantial and should be viewed with caution; but even where the evidence is entirely circumstantial, if it reasonably tends to prove the guilt of the accused, a verdict based thereon carries the same presumption of correctness as other verdicts and should not be disturbed unless wholly unwarranted. State v. Peterson, 110 Utah 413, 174 P.2d 843; 24 C.J.S. Criminal Law § 1882. A consideration of

2. Early pronouncements on this point were contained in Rainsford v. Massen-gale, 5 Wyo. 1, 35 P. 774, and Cornish v. Territory, 3 Wyo. 95, 3 P. 793.

the entire record indicates that there was substantial evidence presented to the jury upon which it was legally entitled to find the defendant guilty of the crime of larceny.

■ Defendant argues that there was no proper foundation for the introduction by the State of photographs and samples of wool. While the foundation for some of these exhibits was not clear cut and perhaps was subject to question,[3] they constituted cumulative evidence apparently introduced in order to support the testimony of Iturrian and the officers and the receipt did not constitute prejudicial error. Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann.Cas.1913E, 218.

■ Defendant objected to the testimony of Iturrian showing that Jean Murdock after the commingling of the sheep had passed near him without stopping to talk to him. It was urged that no relationship was shown with defendant Murdock. Although the testimony was perhaps objectionable on this ground at the time of its submission, defendant later stated that Jean Murdock, his wife, was his partner in the sheep business. Moreover, as far as the record shows, the conviction does not rest upon any failure to report stray sheep, and under this state of facts, we think there was no prejudice.

The witness Iturrian was asked, "Is there a law or a custom in usage with respect to lost sheep?" and after he answered affirmatively, "Would you tell the Court and jury what it is?" The following objection was then interposed, "Object to that as being totally hearsay, in no way binding, not tending to prove or disprove any of the issues in this case, and outside of the case entirely; entirely incompetent, irrelevant and immaterial."

■ It is now urged that the custom was not properly proved, and authorities are cited [4] that evidence of custom is sometimes restricted unless there is sufficient foundation and showing of qualification of the witness. Since the objection was not originally made on the ground now urged, the argument is without force. The objection on the ground of hearsay was not valid since the credibility to be given to any answer did not depend upon the veracity or competency of a person other than the witness. 20 Am.Jur. Evidence §§ 451, 454; see also 5 Wigmore on Evidence, 3 ed., p. 2 ff. The statement that it was in no way binding or tending to prove or disprove any issues of the case and outside the case entirely was perhaps another way of saying that it was irrelevant, but there was no showing either in the trial court or here that custom is outside the issues. The objection of incompetency, irrelevancy, and immateriality is not sufficiently specific to raise any question for decision; State v. Goddard, 69 Or. 73, 133 P. 90, 138 P. 243. See 3 Am.Jur. Appeal and Error § 347. The objector should lay his finger on the particular point intended to be raised so that the trial court will have notice and an opportunity to cure the alleged error. It follows that there was no error in the trial court's overruling of defendant's objection.

■ Kealear, being interrogated regarding the ewe that was found in the chute, was asked to state his opinion as to how long since the wool had been clipped. Defendant objected on the ground that this was not a proper subject for opinion evi-

---

3. "As with demonstrative evidence generally, the prime condition on admissibility is that the photograph be identified by a witness as a portrayal of certain facts relevant to the issue, and verified by such a witness on personal knowledge as a correct representation of these facts. * * *" McCormick on Evidence, 1954, § 181. See Metcalfe v. Winchester, 72 Wyo. 142, 262 P.2d 404. See also 32 C.J.S. Evidence § 715; 53 Am.Jur. Trial § 100; 20 Am.Jur. Evidence §§ 727, 730; 3 Wigmore on Evidence, 3 ed., § 792; 3 Jones on Evidence, 5 ed., § 627. As to the procedure in introducing photographs, see Scott, Photographic Evidence, 1942, § 824.

4. 32 C.J.S. Evidence § 483; 20 Am.Jur. Evidence § 333.

dence, seemingly on the theory that all facts relating to the clipping were apparent to the eyes of the average person. The trial judge should be permitted to exercise discretion in rulings of this nature, rejecting the opinion when it is superfluous in the sense that it would have no value to the jury. 7 Wigmore on Evidence, 3 ed., § 1918; McCormick on Evidence, 1954, § 11; 2 Wharton's Criminal Evidence, 12 ed., § 493. In the instant situation the answer of the witness first stated the condition of the wool, but in response to further questions the witness gave his opinion of the time of clipping and reasons therefor which do not appear to be matters apparent to anyone. Accordingly, there was no abuse of discretion by the trial court in admitting the evidence.

 Defendant also raises as prejudicial error other rulings on evidence but fails to present any cogent reasons to support his view. Among other things, it is urged that numerous improper rulings of the court although perhaps not prejudicial in themselves constituted en masse a situation which prevented defendant from having a fair trial. From our review of the record, we are unable to agree, and it appears to us that there was no manifest unfairness by the trial court in its rulings.

This leads us to a discussion of the alleged errors designated, "Interruptions by the Court and Limitation of Examination by Counsel for Defendant," being a recitation of numerous rulings and comments by the court, and "Presiding Judge's Conduct toward Counsel for Defendant," relating to the occurrences following counsel's failure to stand at the lectern when interrogating witnesses. An objective analysis of all of the evidence while reflecting numerous adverse rulings against defendant, some on rather close points, shows a substantially like number of such rulings against the State. We are, of course, unable to know

about the intonation of the court or have a complete picture of the atmosphere of the trial. We are, however, fully cognizant of the fact that the trial of cases in this country is by its very nature an adversary proceeding in which there are often said and done things which would have been avoided by mature reflection. It is inevitable therefore that the trial judge, only human, will react unfavorably to certain behavior of counsel.

 Appellate courts have always been reluctant to interfere with trial courts in the governing of the litigation, unless there appears to be an arbitrary exercise of authority which interferes with the proper administration of justice and is prejudicial to the appellant.[5] In the present case, there appears to have been no abuse of discretion by the court even in the matter of failure of defendant's counsel to use the lectern. On this latter point, we take judicial notice of the court rules of the seventh district in Fremont County, including that on court decorum which states:

> "Lawyers will stand when addressing the Court or jury or examining witnesses and, excepting when making objection to testimony during the trial of a case, will take their position at the lectern while speaking."

During defense counsel's cross-examination of witness Kealear, the following exchange occurred:

> "The Court: Mr. Moran, the rule of this Court is that counsel will remain at this lectern. Will you please return to this lectern?
>
> "Mr. Moran: I will, but I will advise the Court that I will exercise the freedom of the court room as is necessary in examining the witness.
>
> "The Court: You know the rules of the Court, Mr. Moran. Hand him the exhibit if you want to, and then return to the lectern."

5. 3 Am.Jur. Appeal and Error § 1052; and see the extended discussion in Annotation, 62 A.L.R.2d 166; Annotation, 42 L.R.A.,N.S., 428.

Sometime later during the cross-examination of witness Logan the following exchange occurred:

"The Court: Mr. Moran, will you resume your place over here (indicating)? I do not allow counsel to stand over a witness and question him. Please take your place back over here (indicating).

"Mr. Moran: We accede but object to the ruling of the Court on the basis that it is an unwarranted interference with counsel in the examination of the witness.

"The Court: Well, I will settle that with you after the trial, Mr. Moran."

The above-quoted rule was clear, and so far as the record shows had never been questioned by any lawyer in the district. Defense counsel by challenging the ruling placed the trial court in an unfortunate situation which reasonably admitted of only two possible solutions, either of which was undesirable: (a) the abandonment of control of the litigation by the court or (b) some positive effort to retain control. Actually, the court temporized and postponed immediate action, minimizing any immediate overt clash before the jury.

It is essential that both litigants and counsel be afforded fair treatment in all trials if there is to be effective administration of justice. Any interference with or impingement upon the rights of litigants or counsel cannot be tolerated, but this does not mean that there may be violation of standing court rules, nor do we think that it is essential that the trial court issue warnings before the rules are enforced. If there was any question about the propriety of this rule it was not shown in the record, and no such question has ever been presented to this court which by the constitution has been delegated a general superintending control over district courts.[6]

Although the record recites the conversation between court and counsel which followed the trial, no part of this occurred before the jury, and we are unconvinced that any treatment of counsel by the court was prejudicial to defendant's rights.

. Defendant complains that Instructions 6, 7, 8, and 11 were not complete and proper statements of the law applicable to the case and that Instructions A to H inclusive were proper and should have been given.

Instruction 6 which purports to give the allegations of the charge is admitted by defendant to be a proper statement of the essential elements of the crime charged but not one which makes sufficiently clear that each of the elements set forth is equally important and that the presence of each must be shown. This criticism is unwarranted since the last paragraph of Instruction 6 reads:

"You will consider each of the above charges separately, and before you can convict the defendant upon any one of said charges, it is incumbent upon the prosecution, which is the State of Wyoming, to prove each and every one of the material allegations of such charge as set forth above beyond a reasonable doubt."

It is difficult to imagine a clearer requirement of the necessity of proof of each of the essential elements; the instruction was sufficient; and it was unnecessary to supplement it by proffered Instruction B.

Instruction 7 claimed by defendant to be error reads:

"When, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if the jury finds that the crime was committed, it is not necessary that the proof show that it was committed on that precise date; It is sufficient if the proof shows that the crime was committed on or about that date."

It is argued that this unduly emphasized the "on or about" date and gave the impression

6. Wyo.Const., Art. 5, § 2.

that the actual date was not material. In State v. Koch, 64 Wyo. 175, 189 P.2d 162, 167, we said:

> "* * * Ordinarily a charge that the crime was committed at or about the time alleged in the information or within a given period before the filing of the indictment or information is sufficient. * * *"

This rule is applicable unless two or more similar offenses be shown by the evidence upon either of which the jury might convict. People v. Whitacre, 79 Cal.App. 27, 248 P. 924; People v. Carmean, 23 Cal. App. 396, 138 P. 117. In the present case the evidence related to only one crime of larceny and only one was charged so that the instruction did not unduly emphasize the date.

■■■ Instruction 8, given over the objection of defendant, reads:

> "The Court instructs the jury that the intent with which an act is done, is an act or emotion of the mind, seldom, if ever, capable of direct and positive proof, but it is to be arrived at by such just and reasonable deduction of inference from the acts and facts provided as the guarded judgment of a candid and cautious man would ordinarily draw therefrom.
>
> "The law warrants the presumption, or inference, that a person intends the results or consequences to follow an act which he intentionally commits, which ordinarily do follow such acts."

It is argued that this was not proper in the present case where intent was an essential element because the jurors were not informed of the particular act to which the instruction referred which in effect did away with the necessity of the proof of intent. No cases are cited to substantiate the charge of impropriety; and although the instruction does not appear to have been essential in the present case, was not in the words normally used, and is not very meaningful, we are unconvinced that

any prejudice could have resulted therefrom. It is a general rule applicable in all criminal cases, including those in which a specific intent is an element of the crime, that the accused is presumed to intend the necessary or the natural and probable consequences of his unlawful voluntary acts. State v. Vinson, 269 Wis. 305, 68 N.W.2d 712, 70 N.W.2d 1.

■ Defendant charges that Instruction 11 which is concerned with circumstantial evidence is neither proper nor sufficient as applied to this case because here "all of the evidence is circumstantial." This generic criticism fails to point out in what particular the instruction is insufficient, but in the light of defendant's citing Gardner v. State, 27 Wyo. 316, 196 P. 750, 15 A.L.R. 1040, we assume that it is because of an omission to give the substance of a quotation in the Gardner case at 196 P. 751, " 'In order to convict on circumstantial evidence, it is held necessary, not only that the circumstances all concur to show that the prisoner committed the crime, but that they all be inconsistent with any other rational conclusion.' " It is unnecessary to discuss the basic philosophy of the Gardner case except to say that it was concerned with a situation where the evidence was wholly circumstantial whereas in the present case portions of the evidence were direct.

■ It is argued that Instructions A to H inclusive, refused by the court, while in some instances partly repetitious and duplicating each other are correct statements of the law and should have been given. No cases are cited on the point, and the argument is general. It would be impractical to require a trial court to give all of the instructions submitted even if they represented correct statements of the law applicable to the case. The result would be a jumble of instructions so encyclopedic and alternative as to be more confusing than helpful. A jury must be instructed on all material essentials,[7] and in

7. Roland v. Terryland, Inc., 221 Ark. 837, 256 S.W.2d 315.

criminal causes certain matters have been determined to be so fundamental that failure to clarify them is prejudicial to a defendant. However, the instructions here refused are not within such category, and there is no adequate showing of either error or prejudice to the defendant by reason of the fact that they were refused.

From what we have said, it is manifest that the identification of exhibits, the questioning of the witnesses, the instruction of the jury, and the demeanor of the participants might not be beyond criticism, but lack of perfection is not synonymous with prejudicial error. The evidence in the case under interpretations legally permitted to the jury established a sufficient basis for the verdict rendered, and the judgment and sentence must accordingly be affirmed.

Affirmed.