**TR, Appellant (Defendant),**

v.

**WASHAKIE COUNTY DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Appellee (Plaintiff).**

No. C–86–1.

Supreme Court of Wyoming.

April 27, 1987.

H. Richard Hopkinson and Charles K. Moss, Worland, for appellant.

A.G. McClintock, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for the State.

Jeffrey A. Donnell, Worland, for appellee/guardian ad litem.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

THOMAS, Justice.

The foremost issue in this sad case is whether the record encompasses sufficient evidence to justify the termination of a young mother's parental rights with respect to her three daughters. The mother also contends that the trial court erred in failing to invoke a less intrusive or restrictive alternative to the termination of her parental rights, and she attacks the court's instruction in which the contentions and theories of the parties were articulated. In addition, she asserts unconstitutional vagueness with respect to material provisions of the statutes which authorize the termination of parental rights and argues the statutory scheme is unconstitutional because it fails to incorporate standards for determining when a petition to terminate parental rights should be filed. We conclude, as did the trial court, that the evidence is ample to sustain the findings of the jury in its special verdict. We hold that the trial court did not err by refusing to invoke a less intrusive or restrictive alternative to termination of parental rights and that the challenged instruction was appropriate. Valid principles of appellate jurisprudence foreclose us from addressing the claims of unconstitutionality submitted by the appellant. The judgment of the trial court is affirmed.

After almost six years of efforts to adjust the parenting practices of this young mother and relieve the deplorable conditions in which her three daughters were being raised, the Washakie County Department of Public Assistance and Social Services (DPASS) filed a petition in district court for the termination of the parental rights of the mother. The petition invoked the provisions of § 14–2–309(a)(iii), W.S. 1977, and alleged that each of the children had been neglected or abused by the mother, the efforts of DPASS to rehabilitate the family had been unsuccessful, and the children's health and safety would be seriously jeopardized if they remained with or were returned to the mother.

The district court appointed counsel to represent the mother who has prosecuted these proceedings as a poor person without funds to secure representation of her rights, and the several children were represented separately by a guardian ad litem in accordance with § 14–3–211, W.S.1977. In due course, the case came on for a jury trial which was requested by the mother, and the jury returned a special verdict find-

ing against the mother with respect to each of the daughters. The district court entered its order terminating the mother's parental rights. The mother then filed a motion for judgment notwithstanding the verdict and a motion for a new trial, both of which were denied by the district court. The mother appeals from the order terminating her parental rights and also the order denying her motion for a directed verdict and her motion for a new trial.

By her Brief of Appellant, the mother submits the following issues in this appeal:

"1. Whether or not there was sufficient evidence to support the determination that the parental rights of [the mother] to her children should be terminated.

"2. Whether or not the trial court erred in failing to apply a less intrusive or restrictive alternative before terminating parental rights of appellant.

"3. Whether or not Wyoming Statute Sections 14–2–309(a)(iii) and 14–3–202(a)(vii) are unconstitutionally vague.

"4. Whether or not jury instruction number 5 on contentions of the parties was improper.

"5. Whether or not Wyoming's termination of parental rights statutes are unconstitutional because they do not contain standards to determine initially when a petition to terminate these rights should be filed."

The guardian ad litem filed a Brief of Appellee and accepted the issues as stated by the mother. DPASS set forth the issues in this way in its Brief of Appellee:

"I. There was sufficient evidence to support the verdict.

"II. The trial court did not err in refusing to apply a less intrusive or restrictive alternative.

"III. W.S. 14–2–309(a)(iii) and W.S. 14–3–202(a)(vii) are not unconstitutional.

"IV. Jury Instruction Number Five as to the contentions of the parties was proper.

"V. Wyoming statutes on termination of parental rights are not unconstitutional for lack of standards to determine when a petition to terminate should be filed."

The several special verdicts submitted to the jury track the requirements of the statutes as they have been interpreted by this court. Each of those forms read:

"VERDICT

"With respect to [the child], we the jury find:

"1. [The child] has been abused or neglected by her mother, [mother's name].

"CHECK ONE _____ YES _____ NO

"2. That the health and safety of [the child] would be seriously jeopardized by remaining with her mother, [mother's name].

"CHECK ONE _____ YES _____ NO

"3. That efforts by an authorized agency have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment.

"CHECK ONE _____ YES _____ NO

"If you answer all of the above questions 'YES' the parental rights of [mother's name] to [the child] will be terminated; if you answer *any* of the questions 'NO' her parental rights will not be terminated."

As to each of the children, the jury checked yes in response to each of the questions on the verdict form.

The statute pursuant to which the termination of rights proceeding was initiated provides for the termination of parental rights if it is established by clear and convincing evidence that:

"The child has been abused or neglected by the parent and efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;" Section 14–2–309(a)(iii), W.S.1977 (July 1986 Revision).

In applying this statute, we have said that three elements must be established before the termination of parental rights is justified:

"(1) [A]busive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family (i.e. termination of parental rights is the least intrusive means to satisfy the State's interest);

and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent." *Matter of GP*, Wyo., 679 P.2d 976, 1005 (1984).

■ Because the right of familial association is a fundamental liberty, our rule is that the application of the statutes for termination of parental rights is a subject of strict scrutiny. *DS and RS v. Department of Public Assistance and Social Services*, Wyo., 607 P.2d 911 (1980). See also, *Matter of Parental Rights of PP*, Wyo., 648 P.2d 512 (1982); *State in Interest of C*, Wyo., 638 P.2d 165 (1981). The strict scrutiny standard arises from the conflict between the fundamental liberty of familial association and the compelling interest of the state in protecting the welfare of children. *Matter of MLM*, Wyo., 682 P.2d 982 (1984); *Matter of SKJ*, Wyo., 673 P.2d 640 (1983); *Matter of GP*, supra.

Even though the application of the termination of parental rights statutes is a matter for strict scrutiny, the standard for reviewing evidence was articulated in *DS and RS v. Department of Public Assistance and Social Services*, supra, at 919–920 in this way:

" * * * We will examine the evidence in the light most favorable to the appellee and will resolve all conflicts in evidence for the appellee. *Gray v. Fitzhugh*, Wyo., 576 P.2d 88 (1978). We will assume the evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn from it. *Hammer v. Town of Jackson*, Wyo., 524 P.2d 884 (1974); *Mellor v. Ten Sleep Cattle Co.*, Wyo., 550 P.2d 500 (1976); *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976); and *Douglas Reservoirs Water Users Ass'n v. Cross*, Wyo., 569 P.2d 1280 (1977)."

This standard has been followed consistently in cases involving the termination of parental rights. *Matter of SKJ*, supra; *Matter of Parental Rights of PP*, supra. We must follow it in addressing the first issue raised by the mother in this appeal. The record demonstrates sufficient evidence to justify the jury's conclusion with respect to each daughter, under the clear and convincing evidence standard, that the State established each of the necessary elements to terminate the mother's parental rights under § 14–2–309(a)(iii), supra.

■ While there could be honest debate over the sufficiency of the evidence to establish abuse, the record is not equivocal with respect to neglect. The statutory definition for neglect is:

" * * * [A] failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being." Section 14–3–202(a)(vii), W.S.1977, Cum.Supp.1985.

The testimony of witnesses at the trial established, in accordance with the clear and convincing standard, that the mother did not provide adequate care to these children; she failed to provide proper maintenance and supervision; she failed to provide for their education and medical needs; and generally, she failed to provide other care necessary for their well being.

There were two occasions in which police officers found the children away from their home playing near the street, and when the officers returned the children to their home, they discovered that appellant was asleep during the middle of the day. When confronted with these situations, the appellant advised that she would obtain padlocks to keep the children in, but there was no follow through with respect to that inappropriate plan. It is clear that the appellant was asleep in the middle of the day on one occasion when one of the children set fire to a blanket on a bed which resulted in a fire in a bedroom of the apartment where the family was living that endangered the lives of all the occupants, including the children.

Other witnesses testified that the children were often left in a filthy condition. On occasions in which the children were moved into foster homes, they were described as extremely dirty, and it some-

times took several baths to get them clean. Some of these same witnesses testified that these children appeared to be unfamiliar with eating utensils and that their custom was to obtain drinking water from the toilet. When the oldest of the children was enrolled in a Headstart program, she often was sent to that program in an unkempt and dirty condition. This parental failure caused difficulty for the child because other children would not associate with her. It inhibited interaction and at times even led to isolation. On one occasion, the child complained that her feet were sore. When the teacher removed her shoes, she discovered that the little girl's feet were raw, and the shoes and feet reeked of cat feces to such an extent that the teacher literally gagged.

The children were often described as hungry, and inquiry into their eating habits disclosed a lack of effort to provide an appropriate diet. Cereal and "junk" food seemed to be the primary diet which the mother was furnishing for them. The teacher in charge of the Headstart program said that the oldest child often was hungry, and complained that she had not had breakfast prior to attending the program.

During a period of time when DPASS had temporary custody, the little girls were taken to a dentist who examined their teeth and determined that all of them had badly decayed teeth. Some teeth were abscessed, and one of the girls had a front tooth broken off which was abscessed. The dentist testified that the condition of these teeth in children of the young age of these girls was due to lack of proper nutrition and supervision. The dentist prepared a treatment plan so that the necessary approval for DPASS to pay the dental expenses could be obtained. Even after the payment for the dental expenses had been arranged, the mother still failed to take the children for their appointments, and the dental treatment was only completed during a subsequent period of temporary custody by DPASS.

Other appropriate medical care for the children was not pursued by the mother, including the usual immunizations for DPT, polio and MMR. Ultimately, the oldest child received the required immunizations in order to attend school but not as a product of routine medical attention being provided. The record also contains evidence that the mother did not provide proper medical attention for one of the little girls who had a hip condition which needed surgical treatment. This medical care was not pursued even though the child complained of pain.

As isolated instances, perhaps none of these events would justify the termination of the mother's parental rights under a standard of strict scrutiny. When these matters are aggregated and the testimony of all of the witnesses is developed, an overall pattern of neglect is evident. The case fits what we said in *Matter of MLM*, supra, 682 P.2d at 988:

"In the ordinary parental rights termination case consideration is given to a combination of factors, incidents and conditions that demonstrate the neglect required to justify termination of rights. Rarely do we find a single condition or incident that standing alone would justify termination. Neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time."

Neglect in this case extended over a period of almost six years and is apparent by the occasions and conditions described by the witnesses and in the exhibits. This record discloses long-term general neglect.

The evidence also is clear and convincing that rehabilitative efforts by authorized agencies were unsuccessful. DPASS made numerous attempts to assist the mother in providing adequate care for her children. Services which were made available included emergency financial assistance, homemaker services and various counseling services. The record discloses that the mother utilized those services which assisted in meeting her personal needs and were financially beneficial. The impression which this created was that primarily it was those services she sought. With respect to services which would have

furnished benefits to her children and assisted her in becoming a better parent, she either refused those offers or did not attempt to take full advantage of them. The arrangement for dental services is an example; the mother continually failed to keep appointments for the children which resulted in refusal by the dentist to do further work until someone else would be responsible for seeing that the children kept their appointments. Housekeeping assistance was offered, but the mother refused that service insisting that the house in which the children lived was taken care of properly and that she did not need that assistance. The record is replete with evidence describing the filthy condition of the house. DPASS continually attempted to assist the mother in improving her parenting and nurturing skills which were things that were desperately needed to improve the lot of these children, and the mother continually refused such assistance. She basically denied the existence of a problem. Only when the mother became present to the possibility of termination of her parental rights does it appear that she made any real effort to improve her parenting skills. Those rehabilitative efforts were short-lived, however, and the mother quickly reverted to her usual style of behavior.

It is as apparent that future rehabilitative efforts would be unsuccessful as it is that they were not successful in the past. The mother and the children were examined by a clinical psychologist who specialized in child psychology. The psychologist testified that the mother's neglect of her children was a product of a long-term developed personality rather than any short-term situation. In response to a question concerning the mother's emotional and social development, the doctor explained that she had difficulty differentiating between people and objects. He testified:

"* * * The three things we look [at] are the way a person relates to objects, to animals and to people. In [the mother's] case there is a kind of blending, and she relates similarly to all three. So that one might put a personal possession such as a car, something people think highly of, or a pet, or a child, and they would all

enjoy similar attention or neglect, whatever the case may be. But the point of it is and the significance of it is that here is a low level of ability to differentiate between those three important areas of relationship in life, and those are the three that one looks at. So, when I describe her as a borderline personality, that is the main thing that I see, that one looks at. And then along with that is a tendency to react to situations in extremes, so there is a tendency to relate based on what will provide immediate sense, gratification, what will have some immediate tangible results rather than make long-range goals."

According to *Reed v. Hunter*, Wyo., 663 P.2d 513 (1983), the jury, having heard this testimony, was free to disregard any or all of it. They were also free, however, to accept it and conclude that it was consistent with the past behavioral patterns of the mother. It is fair then to conclude that future rehabilitative efforts would not be successful. On the evidence in the record, the jury was justified in deciding that the efforts to effect the rehabilitation of the family were unsuccessful and that future efforts would be equally unavailing.

We have pointed out that neglect is not demonstrated by low socio-economic standing and the simple failure to provide all the advantages that a more affluent or better-educated parent might provide. Neither is it demonstrated merely by slovenliness of the house or the children. In *DS and RS v. Department of Public Assistance and Social Services*, supra, 607 P.2d at 919, we noted that such behavior "may offend many of us and may, by some, be characterized as neglect, but is not such neglect—assuming no serious health effect or risk—as will justify termination of parental rights." The evidence in this case, however, did demonstrate that the neglect endangered the health and safety of the children. This is the third element which the State must establish in order to justify the termination of parental rights. The evidence disclosed that the children's physical and psychological health both would be endangered by remaining with the mother.

Her persistent failure to furnish proper medical attention and supervision placed the children's health and safety in constant jeopardy. The clinical psychologist testified that the children's mental health was deteriorating, despite the fact that all of the children were of normal intelligence, and one was described as possibly gifted. That expert witness attributed the deterioration to the environment in which the children lived and the failure of the mother to have any positive interaction with them. We do not hold that failing to provide maximum intellectual stimulation satisfies the third element which the statements established, but it is a factor which may be combined with others to demonstrate that health and safety as in this case would be seriously jeopardized if the children remained with the parent:

" * * * A child has a fundamental right to live in an environment free from filth, health hazards and danger. A child has a right to be properly nourished and educated, and receive necessary medical attention. When the rights of a parent and the rights of a child are on collision course, the rights of the parent must yield. The appropriate state agencies need not wait for a catastrophic event to occur before it takes action." *Matter of MLM,* supra, 682 P.2d at 990.

The mother urges the proposition that these children still are functioning which indicates that they are healthy and safe within the strict scrutiny standard for applying the statute. The guardian ad litem, however, pointedly noted that their right to adequate care necessary for their well being must be something more than the care that would be afforded a family pet. The jury in this case was justified in finding that Washakie County DPASS had produced clear and convincing evidence that the children's health and safety would be seriously jeopardized if they should remain with or if they should be returned to the mother.

Under the standard of strict scrutiny, the statute properly was applied in this instance to terminate the mother's parental rights. The evidence of record is more than sufficient to satisfy our rules.

Turning to the second issue presented in the appellant's brief, we conclude that the trial court did not err in any failure to apply some less intrusive or restrictive alternative to the termination of appellant's parental rights. The appellant is correct in arguing that, under the strict scrutiny standard, the State must demonstrate that a less intrusive or restrictive method of protecting a child has been attempted or is impractical in order to justify the termination of parental rights. *DS and RS v. Department of Public Assistance and Social Services,* supra; *Matter of Parental Rights of PP,* supra. The record in this case demonstrates that less intrusive means were attempted, but that the result was not favorable. Washakie County DPASS attempted to furnish various rehabilitative services and programs for the appellant, and consistently, she refused them or did not follow through in pursuing them. In several instances, these little girls were placed in the temporary custody of foster families under the 72–hour protective provision in the statute. The efforts to deal with the situation continued over a period of six years. Consistently, the mother demonstrated in an ascending manner that she either is unwilling or is unable to provide adequate and necessary care and supervision for her children. We cannot discern that the State failed to attempt any effort which now could be applied other than termination of the mother's parental rights.

The testimony of the expert at trial was to the effect that taking the children out of the mother's home now, placing them in a foster home temporarily and then returning them to her custody at some later time would be more detrimental to these children than either leaving them with the mother or permanently placing them in foster care. Because the mother has demonstrated that she is unable to provide the necessary nurturing and care for her children and also has demonstrated that she is unwilling or unable to improve her efforts, this record satisfactorily demonstrates that a less intrusive means would be impractical

in the future just as it has not worked in the past. The mother now claims that she should be given still another chance and that she can change and become the mother she ought to be. The record belies her willingness to change her lifestyle, and merely claiming that one is willing to change a behavioral pattern evidenced over a period of six years is not sufficient to rebut the strong evidence in this record that further rehabilitative efforts would be impractical and that no less intrusive means to protect these children exist. Under the strict scrutiny standard, there was no error by the trial court in entering its judgment insofar as the need to consider less intrusive and restrictive alternatives is concerned.

The appellant then complains of Instruction No. 5 which was given to the jury. That instruction reads:

"The State contends that [the mother] has neglected her children, * * *; that the health and safety of these children would be seriously jeopardized by remaining with their mother; and that the efforts of an authorized agency, the Washakie County Department of Public Assistance and Social Services (D–PASS) have been unsuccessful in rehabilitating the family, or that services have been refused.

"[The mother] denies the State's contentions and she contends:

"1. That she has provided the children with the best physical care available given her family's limited income,

"2. That the children have not been neglected by her, and

"3. That the children are not in jeopardy by remaining with her.

"[The mother] further contends:

"1. She has given the children all necessary medical care,

"2. That the best place for the children is with their natural mother, and

"3. That the State has not made reasonable or good faith efforts at rehabilitating the family."

■ The mother's argument in connection with her motion for a new trial was that this instruction placed her in a false light and did not fairly articulate her true contentions. She argued that she was not proposing or attempting to appear to be unwilling to work with DPASS or to fulfill any plan or condition which DPASS might require. As we understand this instruction, it states only that the appellant denies each of the elements which must be found to have been established by clear and convincing evidence before her parental rights properly could be terminated. We are unable to perceive how it places her in a false light. She additionally contends before this court that the instruction was misleading and was not sustained by the evidence at trial. Again, we cannot perceive how the instruction was either misleading or not sustained by the evidence. Apparently, it was appellant's desire that no instruction such as this be given because she simply objected to it and did not offer an alternative.

The jury must be instructed on the material essentials of any case. *Murdock v. State*, Wyo., 351 P.2d 674 (1960). The State as a party was entitled to request and have given an instruction with respect to its contention and theory of the case. *Langdon v. Baldwin-Lima-Hamilton Corporation*, Wyo., 494 P.2d 537 (1972). As we understand this instruction, it stated no more than the elements that the State was required to prove before the parental rights of the mother could be terminated; that the State contended the elements were met and that the mother contended they had not been met. We find no error with respect to this instruction either in its wording or the fact that it was given.

■ The other contentions of the mother address the constitutionality of the statute. The rule to be applied is well settled:

" * * * [T]hat in the absence of fundamental error affecting a substantial right of the appellant or involving the jurisdiction of the court, we do not consider questions sought to be raised for the first time on appeal. Furthermore, unless plain error is present, questions concerning the constitutionality of a statute are not considered on appeal if the party presenting them failed to present or ar-

gue the contentions in the trial court." *Jahnke v. State*, Wyo., 692 P.2d 911, 928 (1984). (Citations omitted.)

There is no question that termination of parental rights is directed toward a right that is fundamental and substantial. *Matter of GP*, Wyo., 679 P.2d 976 (1984), citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Even though a fundamental right is involved, the appellant's contentions do not raise a fundamental error or jurisdictional issue. Furthermore, there is no indication of plain error. The record and the brief do not demonstrate the existence of a "clear and unequivocal rule of law, which particular facts show was transgressed in a clear and obvious, not merely arguable way." *Jahnke v. State*, supra, at 928. The argument of appellant that someone, somehow, might be affected adversely does not suffice to demonstrate fundamental or plain error. The mother's attempt to raise an arguable constitutional contention coupled with her failure to show how she herself was in any way denied due process or how any alleged vagueness in the statute failed to provide her fair warning concerning what parental conduct was expected of her comes too late. We will not address the constitutional arguments. Our comment of 60 years ago still is true:

" * * * Constitutional questions are too important to be answered by this court at random, and they should not be answered unless fully presented." *Salt Creek Transportation Company v. Public Service Commission*, 37 Wyo. 488, 263 P. 621, 622 (1928).

The judgment of the district court is affirmed.

CARDINE, J., filed a specially concurring opinion.

URBIGKIT, J., filed a concurring opinion.

CARDINE, Justice, specially concurring.

The opinion of the court is an excellent statement of what is statutorily required for termination of the rights of a natural parent by a state agency. I fully agree with the opinion and write this special concurrence only to make clear that I also am "indelibly committed" to the best interest of a child, but wish to make clear that while of paramount importance, the best interest is not the sole consideration in deciding these difficult cases. It is important that we acknowledge our sworn duty to uphold the law and apply statutes enacted by the legislature, which is the branch of government authorized by the constitution to legislate and establish the means and manner of terminating parental rights. It is important also that we understand that each case is different and must be governed by its own special facts and circumstances. Thus, the contest might be between parents having an equal right to custody of a minor child or, as in this case, it might be between a natural parent and a state agency seeking termination of parental rights. As described in the majority opinion of the court, there is a comprehensive set of statutes which prescribe with specificity the matters which must be considered, the rights of the respective parties, and what must be established to terminate the right of the natural parent to the custody of her child. An individual judge has a duty to act in accordance with those statutes and not the freedom to do on an ad hoc basis what according to his education and experience is in his opinion an appropriate disposition.

Suppose the contest were between a natural mother and a young woman who kidnapped a one-day-old baby from a hospital. The kidnapper was not discovered for three years, during which time she mothered and raised this child, provided all necessities, cared for the child very well, and provided an excellent home. The kidnapper is a modestly wealthy person who can give this child all advantages with respect to education, upbringing, and a stable home. The best interests of this child might be that the parental right of the natural mother be terminated and custody be awarded to the kidnapper. There is no legal precedent of which I am aware that would support such a result, and I would hope that even a judge "indelibly committed" to the best

interests of the child would not propose that a person who obtains possession of a child by their wrongful act should somehow gain personal custody as against a natural parent.

URBIGKIT, Justice, concurring.

In concurring with this thoughtfully considered and exhaustively detailed opinion, my concern must be expressed that it is not the parental right which should be given primary concern, whether constitutional or otherwise, when weighed against the best interest of the children as statutorily directed and constitutionally protected. In this case, the detail of invidious and pervasive failure in parenting should not become the minimum requisite in future cases for societal protection for children in contested parental-rights termination.

This Supreme Court is the final repository of constitutional responsibility and should speak to the rights of the children in a balancing test of parental claim against the children's welfare in judicial strict scrutiny. Asserted constitutional rights in parental relationships can be as directly disaffected by adverse social conduct as would effectively result from proscribed behavior under criminal laws. I remain indelibly committed to the best-interest criterion. See my dissent in *Matter of Adoption of BGD*, Wyo., 719 P.2d 1373 (1986), and Note, *Contested Consent to Adoption: No Longer a Decision in the Child's Best Interest*, XXII Land and Water L.Rev. 203 (1987).