In the Interest of JLG and JG, minors.

AG and DG, Appellants (Respondents),

v.

BIG HORN COUNTY DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Appellee (Petitioner).

No. C–88–2.

Supreme Court of Wyoming.

Oct. 4, 1988.

Micheal K. Shoumaker of Shoumaker and Murphy, Sheridan, for appellants.

Joseph B. Meyer, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

MACY, Justice.

This is an appeal from an order of the district court that terminated the parental rights of appellants AG (father) and DG (mother) to their two youngest daughters. Appellants challenge the sufficiency of the evidence to terminate their parental rights and the admission as evidence of a Department of Public Assistance and Social Services (DPASS) file relating to the family.

We affirm.

Appellants were married on January 6, 1983. A daughter (JLG) was born on May 11, 1983, and another daughter (JG) was born on November 14, 1984. The household included these four persons as well as two older daughters of the father from an earlier marriage. In this proceeding, appellants' parental rights to the father's two older daughters were also terminated, but no appeal is taken from that portion of the district court's judgment. We include them in our discussion of this case because testimony from them and about them contributes to our resolution of the issues raised in this appeal.

Although the application of the termination of parental rights statutes is a matter of strict scrutiny, our standard is that, when reviewing the sufficiency of the evidence, this Court assumes that the evidence of the prevailing party is true, leaving out of consideration the evidence presented by the other party in conflict therewith and giving every favorable inference to the evidence of the successful party that may fairly and reasonably be drawn from it. *TR v. Washakie County Department of Public Assistance and Social Services*, 736 P.2d 712 (Wyo.1987).

On February 4, 1985, the father held a gun to his wife's head and threatened her with it in the presence of the children. On October 23, 1985, the father beat his wife in the presence of the two youngest children. As a result of this incident, the children were temporarily removed from the home. However, the domestic violence continued. Just before midnight on November 1, 1985, police were called to the home to investigate a dispute and possible aggravated assault. When the police arrived, the mother was walking away from the trailer park where the family lived. She told the police she was going to the hospital for treatment of a cut she received in a fight with her husband. The police took the mother to the hospital and then returned to the trailer to check on the father. They noticed blood on the front steps, all over the floor in the kitchen, and down the hallway to the bedroom. The father had been stabbed several times with a steak knife by his wife. He had been at the bar earlier that evening. His children had called him twice, and during the second call his wife said she wanted to come down for a drink. Apparently, she went, and, after they arrived back home, the father asked her to fix his lunch for the next day. This precipitated an argument, and the father proceeded to get a sleeping bag so that he could go to sleep on the living room floor because he had to get up at 3:45 a.m. to go to work. The mother then turned up the volume of a portable radio. The father grabbed for the radio, and the mother attacked him and began stabbing him with the steak knife. After the mother left, the

older girls helped their father up off the floor, and he went into the bathroom. When he saw all of the blood, he thought his wife had cut her wrists with a razor blade as she had threatened to do on a previous occasion. The children were all in the home during this episode. The children stayed with a neighbor that night, as did the mother. The father returned to the bar after being treated for superficial wounds. The children were placed in emergency shelter care with the neighbor by DPASS workers. They were later placed in foster care with the consent of appellants. We relate this incident in some detail because it typifies the chaotic and menacing environment that characterized this home.

A clinical psychologist who had twenty-eight years of experience working with children prepared a report which concluded that JLG and JG, as well as the older children, were suffering from severe developmental delays and distortions. The developmental and emotional problems were more severe with the older children but posed serious mental health problems for all four children. The psychologist reported that these problems were the result of the circumstances in which the children were raised. Finally, he predicted that the children would be unable to cope with the situation in the home, and he observed that the severity of the condition of the older children underscored the increasing deterioration that could be expected in the younger children with continual exposure to the unhealthy environment in their home.

In addition to this atmosphere of violence, the children were occasionally disciplined in an abusive manner (bruises from spanking with a belt) and were frequently subjected to generally abusive treatment, such as slapping, hair pulling, and being kicked in the posterior.

On at least one occasion, the children were left unattended. Although the parents had adequate income to provide food, the children frequently went hungry when there was no food in the house for periods of a day or two at a time. The children were also poorly clothed, and neither the children's clothing nor the children themselves were kept clean. The record establishes that, were it not for the "parenting" provided by the oldest child, the other children's condition might have been significantly worse.

Appellants were examined by the psychologist who had examined the children, and he determined that the father suffers from a paranoid personality disorder with alcoholic features. The assessment indicated that the father has the potential to be extremely aggressive with individuals whom he perceives as incapable of retaliation, such as his wife and children, and that the mother suffers from a borderline personality disorder. The psychologist concluded that this combination results in almost constant conflict, strife, violence, aggression, and inadequate planning. The prognosis for change in appellants was very guarded and, while he saw little chance of them hurting each other, the chances of them hurting the children, both physically and mentally, were diagnosed as probable.

The trial court's findings of incidents of abuse and neglect are supported by the record and are sufficient to warrant the termination of appellants' parental rights to JLG and JG.

As a peripheral matter, appellants also question the finding of the court that efforts by DPASS to rehabilitate them were unsuccessful. Findings of the trial court are presumed to be correct and will not be disturbed by this Court unless they are clearly erroneous, inconsistent with the evidence, or contrary to the great weight of the evidence. *Eddy v. First Wyoming Bank, N.A.–Lander,* 750 P.2d 294 (Wyo. 1988); *Pancratz Company, Inc. v. Kloefkorn–Ballard Construction/Development, Inc.,* 720 P.2d 906 (Wyo.1986).

■ Starting in November 1985, DPASS developed a series of treatment plans to assist appellants in regaining custody of their children. The parents failed to comply with three consecutive plans presented to them in November 1985, December 1985, and January 1986. Neither parent would attend parenting classes. The mother nev-

er sought inpatient treatment for her mental problems as recommended by an examining clinical psychologist. The father completed an inpatient alcoholism program at a Veteran's Administration hospital but resumed drinking shortly thereafter. At the time of trial, appellants had done virtually nothing to prepare themselves for the return of their children.

This evidence is sufficient to sustain the trial court's findings that rehabilitation efforts were unsuccessful and that the parents generally refused rehabilitative treatment. *LP v. Natrona County Department of Public Assistance and Social Services*, 679 P.2d 976 (Wyo.1984); *CP v. Laramie County Department of Public Assistance and Social Services*, 648 P.2d 512 (Wyo.1982).

■ Appellants also argue that the district court improperly admitted a DPASS file as evidence in this case. They object to the evidence on the basis of hearsay. The thrust of their argument is that at trial the district court sustained numerous hearsay objections made by appellants' counsel when a DPASS casework supervisor was questioned about the contents of that file, especially those portions that were contributed by other persons. Appellants argue that the admission of that file into evidence makes meaningless all the objections that were sustained. We do not agree. The objections were sustained because the witness in question was asked to give hearsay testimony on the basis of his knowledge of the file. In the absence of an objection to the file, and absent a determination that the source of information or the method or circumstances of preparation of the file indicate a lack of trustworthiness, the file is admissible under W.R.E. 803(6).[1]

AFFIRMED.

---

1. W.R.E. 803(6) provides in pertinent part:

   A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.