2012 WY 99

**In the matter of the Termination of Parental Rights to KMO, DMO, CMO, AKO, DKO, MTO, ABO, EEO, and JBO, Minor Children.**

**HJO, aka HJK, Appellant (Respondent),**

v.

**The State of Wyoming, Department of Family Services, Appellee (Petitioner).**

**No. S-11-0224.**

Supreme Court of Wyoming.

July 23, 2012.

---

See also, 280 P.3d 1216.

Representing Appellant: Donald Lee Tolin of Law Offices of Donald Tolin, Casper, WY.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; and

Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Guardian ad Litem: Cynthia K. Sweet, Casper, WY.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶ 1] HJO (Mother), the biological mother of nine minor children, appeals the district court's order following a jury verdict terminating her parental rights. Mother contests the sufficiency of the evidence presented by the State of Wyoming, Department of Family Services (DFS) to terminate her parental rights, the appropriateness of the special verdict form submitted to the jury, the constitutionality of the termination statute which sets out the burden of proof, and alleged cumulative errors. We affirm.

## ISSUES

[¶ 2] Mother presents four issues for our consideration:

I. Whether the trial court record contains sufficient clear and convincing evidence for the jury to find that the statutory requirements were satisfied for termination of parental rights of Mother as to present unfitness of Mother at the time of trial pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v).

II. Whether the trial court committed reversible error by not requiring the jury to make a finding on the verdict form as to all of the required statutory elements for termination of parental rights under Claim II pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v) as to each child and each parent separately.

III. Whether Mother's due process and equal protection rights under the Wyoming Constitution and the United States Constitution were violated because of the use of the lower burden of proof standard of "clear and convincing evidence" for termination of parental rights instead of the

higher burden of proof standard of "beyond a reasonable doubt."

IV. Whether there was reversible error because of cumulative errors made throughout the termination of parental rights proceedings, thereby violating Mother's procedural and substantive due process.

## FACTS

[¶ 3] Mother has eleven children, two of whom are no longer minors and are not part of this termination action, and nine minor children who are at issue in this termination action: KMO, born December 10, 1995; DMO, born December 12, 1997; CMO, born June 5, 1999; AKO, born September 6, 2001; DKO, born January 11, 2004; MTO, born April 19, 2005; ABO, born August 2, 2006; EEO, born December 21, 2007; and JBO, born December 21, 2007. PRG (Father # 1) is the father of the two children who are no longer minors, and also of KMO, DMO, CMO, and AKO.[1] MBK (Father # 2) is the father of DKO, MTO, ABO, EEO, and JBO.[2]

[¶ 4] This family has a long history with DFS and the juvenile court. Because this case turns in part upon on an ongoing pattern of neglect, we provide an overview of that history here. Additional pertinent details will be reviewed in the discussion below. DFS first had contact with the family in early 1999 after receiving a referral from the State of Nevada about a family moving to Wyoming and in need of services. At that time, there were four children and Mother was pregnant with her fifth child. DFS was informed that Nevada's Child and Family Services had substantiated allegations of neglect against Mother four times between 1996 and 1999, including physical and medical neglect and lack of supervision. Nevada also had concerns about educational issues and the cleanliness of the home. After receiving the intake request from Nevada, DFS offered services to the family and implemented a voluntary case plan.

---

1. PRG's parental rights to his four minor children were terminated on June 6, 2011.

2. MBK relinquished his parental rights to his five children and stipulated to termination of his parental rights on February 18, 2011.

[¶ 5] The children were first taken into protective custody in Wyoming in May of 2001, after Mother reported to an emergency room doctor that she had suicidal ideations and her plan was to drive off of Casper Mountain with her children in the car. At that time, Mother had five children ranging in age from nine years to as young as twenty-three months and was pregnant with her sixth child. The district attorney filed a neglect petition and the children were placed in foster care homes. A case plan was prepared that required Mother to take financial responsibility for her children, get assistance with the stress of raising her children, seek employment, attend counseling, and take any required medications. Mother admitted the allegations of the neglect petition, and in July of 2001 the children were returned to her custody, although they remained in the legal custody of DFS.

[¶ 6] In November of 2002, the children were again placed in protective custody. This time the allegations of neglect were that Father # 1 had left five children, ranging in age from eight years to fourteen months, home alone without adult supervision with the house in disarray, while Mother was at Walmart with the oldest child and involved in a shoplifting incident. DFS substantiated that both Mother and Father # 1 had neglected the children. The district attorney filed a juvenile neglect petition and the court placed the children in DFS custody. The children were placed with a relative and then returned to Mother.

[¶ 7] The children were removed from the home for the third time in May of 2003, based upon new allegations that Mother's home was unclean and unsafe, and that the children had been left alone while Mother was out of town and Father # 1 was at work. DFS substantiated allegations of neglect against both Mother and Father # 1 based upon the condition of the home and because both parents repeatedly left the children without appropriate adult supervision. A neglect petition was filed and the children were placed in foster care. The parents entered a consent decree in October, Mother had her seventh child in January of 2004, and by March of 2004, the other six children had returned to Mother's custody. The case remained open after the children returned home in order to assist the family with continuing issues of safety and the cleanliness of the home, as well as the children's hygiene and tardiness at school.

[¶ 8] While that case was still open, DFS discovered that Mother had developed a friendship with a registered sex offender, Timothy Adams. DFS and the children's therapist notified Mother that Adams posed a significant physical danger to the children. Nevertheless, Mother continued to allow Adams to have contact with the children in the summer and fall of 2004 at his home and at Mother's home, and she allowed Adams to take her then six-year-old daughter on an overnight trip to Cheyenne. Adams later was charged with and pleaded guilty to taking indecent liberties with three of Mother's children (including the oldest daughter, who is not part of this action). DFS substantiated allegations of abuse against Mother for her part in allowing the children to be exposed to a known sex offender.

[¶ 9] Between 2004 and the spring of 2008, the children remained in Mother's custody, and Mother had four more children. During this time frame, Mother lived in a six-bedroom home provided by Housing Alternatives Incorporated, which provided HUD regulated low-income housing. Throughout Mother's tenancy, various issues arose concerning the cleanliness of the home. In February of 2008, Housing Alternatives notified Mother of the termination of her lease effective April 1, 2008, based upon the unclean, unsanitary, and unsafe condition of the home. Prior to the April 1 deadline, several things occurred to cause the family to once again come under the jurisdiction of the juvenile court.

[¶ 10] In November of 2007, DFS opened an investigation after receiving a school report that the oldest child was missing far too much school for what the child said was babysitting her siblings. In February of 2008, DFS substantiated allegations of neglect against Mother for failing to pick up her four-year-old from the Child Development Center. In early March of 2008, the four-year-old was playing unsupervised in a

basement closet in the home with a lighter and started a fire. The family had to vacate the home due to over $48,000.00 in fire damage. When DFS learned of the fire on March 11, 2008, the children were placed into the protective custody of the State of Wyoming for the fourth time, based upon the fire, the conditions of the home as reported by a paramedic who responded to the fire, and growing concerns for the safety of the children while in Mother's care. Thus began the fourth and final juvenile case. DFS substantiated allegations of neglect against Mother, Father # 1, and Father # 2 for the conditions that led to the protective custody, and based upon evidence of ongoing neglect. The three parents eventually stipulated to the adjudication of the children as neglected, and all eleven children were placed in foster care. Mother, Father # 1, and Father # 2 determined that they wanted the children to be reunified with Mother and Father # 2, and at the dispositional hearing on October 1, 2008, the district court approved the family service plan for reunification.

[¶ 11] In October of 2008 the twins, then about ten months old, were placed with Mother for a trial home placement. By May of 2009, the seven-year-old and nine-year-old were also placed with Mother for a trial home placement, and by July of 2009, the then five-year-old had been returned to Mother's custody as well. However, by early fall the conditions in the home began to deteriorate. DFS received reports that the children were late for school, were going to school dirty and hungry, the condition of the home was worse, and the children were not getting prescribed medications consistently. Based upon these reports and the fact that one of the twins had broken her arm while in the home with no explanation of how the break occurred, the five children then in Mother's custody were removed from the home and placed into foster care on October 30, 2009. During the ensuing investigation, DFS learned that there had been domestic violence in the home when the children were present and discovered other injuries to the twin with the broken arm, including bruising

in her eye area, fingernail marks on her stomach, and abrasions on her back. Three of the boys were engaging in inappropriate sexual behavior. The twins had severely concerning developmental delays. DFS substantiated the allegations of neglect against Mother for the five minor children previously returned to the home.

[¶ 12] In January of 2010, DFS completed case plans for Mother, Father # 1, and Father # 2. At the time, Mother and Father # 2 had separated and Father # 2 had filed for divorce. Mother moved in with Father # 1 for a time, lived in her van for a time, then in a homeless shelter, and then moved back with Father # 2. She remained unemployed. At a permanency hearing in March of 2010, the district court determined that Mother had not made sufficient progress on her case plan to justify continuing efforts at reunification of the children with her. In August of 2010, the court ordered that the permanency goal be changed to termination of parental rights and adoption for Mother's nine youngest children.[3] DFS filed a petition to terminate Mother's rights on December 7, 2010. At the conclusion of a three-week jury trial, the jury returned a verdict finding that Mother's parental rights to the children should be terminated. The district court entered an order terminating Mother's parental rights on June 6, 2011. This appeal followed.

## DISCUSSION

*Sufficiency of the Evidence*

[¶ 13] Mother contends that there was insufficient evidence to support the jury's verdict terminating her parental rights to her nine children. Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, this Court strictly scrutinizes petitions to terminate parental rights. *LS v. Johnson County Dep't of Family Servs. (In re CS)*, 2006 WY 130, ¶ 7, 143 P.3d 918, 921 (Wyo.2006); *TR v. Washakie County Dep't of Pub. Assistance*

**3.** The two oldest children had permanency plans of independent living and guardianship. Both have now reached the age of majority.

*Social Servs.*, 736 P.2d 712, 715 (Wyo.1987). The grounds for termination must be established by clear and convincing evidence. Wyo. Stat. Ann. 14–2–309(a) (LexisNexis 2011). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *LS,* ¶ 7, 143 P.3d at 921. When a party challenges the sufficiency of the evidence supporting termination, we apply our traditional principles of evidentiary review. *TMC v. Dep't of Family Servs. (In re ARC),* 2011 WY 119, ¶ 13, 258 P.3d 704, 708 (Wyo. 2011). "We examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party." *Id.; RS v. Dep't of Family Servs. (In re KLS),* 2004 WY 87, ¶ 11, 94 P.3d 1025, 1028 (Wyo.2004); *DKM v. RJS (In re SYM),* 924 P.2d 985, 987 (Wyo.1996).

[¶ 14]   The jury based its decision to terminate on Wyo. Stat. Ann. § 14–2–309(a)(v) (LexisNexis 2011), which provides:

> **§ 14–2–309.  Grounds for termination of parent-child relationship;  clear and convincing evidence.**
>
> (a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
>
>     . . . .
>
>         (v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

The first element of § 14–2–309(a)(v) required DFS to prove that the children had been in foster care under the responsibility of the State of Wyoming for fifteen of the most recent twenty-two months. The record is clear that at the time of trial in April of 2011, none of the children had been in the home since the five younger children were removed from Mother's custody on October 30, 2009. Thus, all of the children were in foster care under the responsibility of the State of Wyoming for at least seventeen months at the time of trial. Mother does not

dispute this. However, Mother contends that the "fifteen of the most recent twenty-two months" element was satisfied only because of actions by DFS during the case; specifically, failing to file the termination petition within 60 days of the juvenile court's determination that reunification was no longer the permanency plan for the children and failing to place the children with relatives. These actions, argues Mother, provided DFS with an additional statutory basis to pursue termination of Mother's parental rights that would not otherwise have been available.

[¶ 15]   Neither the Child Protection Act nor the termination statutes impose a filing deadline applicable to the grounds on which the petition was filed against Mother in this case. Mother points to Wyo. Stat. Ann. § 14–3–431(*o* ) (LexisNexis 2011), which is part of the Child Protection Act. That section provides: "A petition to terminate parental rights shall be filed within sixty (60) days of a judicial determination that reasonable efforts to reunify the child and parent are not required pursuant to W.S. 14–2–309(a)(vi), (b) or (c)." However, DFS did not seek termination of Mother's parental rights pursuant to § 14–2–309(a)(vi), (b) or (c), and there was no determination in the underlying juvenile proceeding with respect to those statutory sections. In short, § 14–3–431(*o* ) does not apply here.

[¶ 16]   Mother also directs us to Wyo. Stat. Ann. § 14–3–431(m) (LexisNexis 2011), suggesting that the fifteen of the twenty-two month timeline is "tolled" if a child is placed with a relative. This is an incorrect statement of the law. Section 14–3–431(m) provides in pertinent part:

> (m) When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights or seek to be joined as a party to the petition if a petition has been filed by another party, unless:
>
>         (i) The child is in the care of a relative[.]

This provision does not preclude the State from filing a termination petition if a child is

in relative care for fifteen of the most recent twenty-two months; rather, it makes filing a termination petition in that circumstance optional. As such, this provision does not support Mother's position that relative care would have foreclosed DFS's use of § 14–2–309(a)(v) as a basis for termination of Mother's parental rights.

[¶ 17] We conclude that DFS proved by clear and convincing evidence that all nine children were in foster care under the responsibility of the State for fifteen of the most recent twenty-two months at the time of trial and thus satisfied the first element of § 14–2–309(a)(v).

[¶ 18] The second element of § 14–2–309(a)(v) requires DFS to prove by clear and convincing evidence that Mother was "unfit to have custody and control" of the children. Mother contends that there was no evidence presented that she was unfit at the time of trial, that DFS relied solely upon Mother's past behavior, and that the prior cases should have been irrelevant to the present case because all of her children were returned to her in each of the prior cases.

[¶ 19] The term "unfit" is not defined in the termination statutes but we have previously recognized that "fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child." *RLA v. State of Wyo., Dep't of Family Servs. (In re LA)*, 2009 WY 109, ¶ 14, 215 P.3d 266, 269 (Wyo.2009). "Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child." *AJJ v. State (In re KMJ)*, 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo.2010). Mother is correct that the statute requires a finding of unfitness at the time of the termination trial. *Id.*, ¶ 17, 242 P.3d at 971. "That does not mean, however, that the district court must ignore evidence of a parent's previous unfitness." *Id.* Evidence of past behavior is "plainly relevant in determining current parental fitness." *JD v. State (In re AE)*, 2009 WY 78, ¶ 18, 208 P.3d 1323, 1328 (Wyo.2009).

[¶ 20] We have carefully reviewed the record and conclude that the jury's determination is supported by clear and convincing evidence. During the three-week trial, the jury heard extensive testimony from case workers, law enforcement officers, mental health professionals, school personnel, and a housing authority case manager concerning Mother's past parenting behavior. The record shows that from 1999, when Mother and her children moved to Wyoming, through October of 2009, the children had been in the protective custody of the State of Wyoming at least four times. DFS substantiated allegations of neglect against Mother on several occasions. The district attorney's office filed four separate neglect petitions resulting in numerous foster care placements of the children. DFS continually received reports concerning lack of supervision of the children, unsanitary and unsafe living conditions, poor school attendance, the children's poor hygiene, the children's inappropriate dress, and Mother's failure to meet the mental health needs of the children. In addition, Mother allowed a registered sex offender to have access to the children. The record is replete with reports concerning schooling, the children's hygiene, the cleanliness of the home, the appropriateness of Mother's housing, Mother's lack of employment, and Mother's financial difficulties. DFS received these reports in March of 2008 and in the preceding years and was still receiving such reports in October of 2009, the last time the children were in the home.

[¶ 21] In addition to the extensive history of neglect and unfitness, DFS also presented evidence as to Mother's current circumstances and her inability to provide for the physical, mental, and emotional needs of her children. The jury heard testimony from Kathy England, a licensed professional counselor who had been involved with the family since 2001 and has a significant amount of experience with abused and neglected children. Ms. England testified that the children need an environment where their parents follow through with the children's education, have a budget, have housing, have an awareness of what behaviors put the children at risk, have a plan to keep

the children safe, and are able to provide appropriate supervision for the children.

[¶ 22]   The evidence showed that Mother was not able to provide financial stability for the children.   Mother's employment history from the time the children were last removed from her home in October of 2009 was one month at Burger King in 2010 and about six weeks at a house-cleaning service immediately before the termination trial, where her hours and income varied.

[¶ 23]   At the time of trial, Mother was living in a two-bedroom home with an upstairs loft area that could be used as additional sleeping space.   The landlord stated that the home was not certified for more than six people.   Despite being told from the beginning of the 2008 juvenile case that the home was too small, Mother failed to obtain a larger home by the time of trial.   In addition, Mother was sharing the home with Father # 2 and they were in the process of getting a divorce.   Mother and Father # 2 have a history of domestic violence and the children were in Mother's custody during several incidents.   This Court has stated, "Children are victimized by a climate of violence existing between their parents, even if they are not direct targets of the abuse."   *RS*, ¶ 21, 94 P.3d at 1030–31.   Given the volatility of their relationship, Mother's decision to continue to live with Father # 2 at the time of trial supports the jury's finding of unfitness.

[¶ 24]   Perhaps the most concerning testimony from Mother related to the sexual abuse of her children by a known sex offender, Timothy Adams, who she introduced into their lives.   At trial, Mother refused to acknowledge that Adams had sexually abused her children and even denied his convictions for such abuse.   Some of Mother's children continue to have grave problems which counselors relate back to the abuse that Adams inflicted, yet Mother refused to acknowledge the severity of those problems.

[¶ 25]   Ms. England expressed her expert opinion, based upon her involvement with the family, that Mother does not recognize the needs of her children, is not aware of the necessary level of parental involvement required to provide emotional health and well-being for her children, and cannot provide the kind of environment the children need in order to be successful.   She testified that despite the extensive services provided over the years, Mother failed to make lasting progress in providing her children with a safe and stable home, appropriate supervision, and appropriate educational and therapeutic support.   This opinion, too, is strong support for the jury's finding of unfitness.

[¶ 26]   Mother recites the evidence presented at trial that was favorable to her, including her own testimony and that of her expert. However, it is the jury's responsibility to weigh the evidence and assess the credibility of the witnesses.   *Anderson v. State*, 2009 WY 119, ¶ 12, 216 P.3d 1143, 1146 (Wyo.2009) (citing *Creecy v. State*, 2009 WY 89, ¶ 28, 210 P.3d 1089, 1096 (Wyo.2009)).   In determining whether sufficient evidence supported the jury's verdict, we do not reweigh the evidence.   *JLW v. CAB (In re WDW)*, 2010 WY 9, ¶ 17, 224 P.3d 14, 19 (Wyo.2010). The role of this Court is to review the evidence in the light most favorable to the prevailing party and determine whether that evidence clearly and convincingly satisfies the statutory elements required to support a termination of parental rights.   *RS*, ¶ 11, 94 P.3d at 1028.   Here, evidence of numerous incidents and conditions occurring over the entire lifetimes of these nine minor children clearly and convincingly supports the jury's finding that Mother is unfit to have custody and control of them.

*Jury Verdict Form*

[¶ 27]   Mother proposed a verdict form that required the jury to find the elements of Wyo. Stat. Ann. § 14–2–309(a)(iii) and (v) (LexisNexis 2011) as to each of the nine children involved in the case.[4]   DFS proposed, and the district court

---

4.   The termination action against Mother was based upon Wyo. Stat. Ann. § 14–2–309(a)(iii) and (v) (LexisNexis 2011).   The jury based its decision to terminate upon § 14–2–309(a)(v). Parental rights may be terminated on a finding of just one of the subsections enunciated in § 14–2–309.   *MN v. State, Dep't of Family Servs. (In the Interest of MN)*, 2003 WY 135, ¶ 31, 78 P.3d 232, 239 (Wyo.2003).

submitted to the jury, a verdict form that required the jury to find the elements of § 14–2–309(a)(iii) and (v) as to the nine children as a group. Mother contends that the use of a verdict form that did not require the jury to make a finding as to each element for each child was inherently unfair and prejudicial to her, violated her due process rights under the Wyoming and United States constitutions, and requires reversal.

[¶ 28] "The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." *DH v. Wyo. Dept of Family Servs. (In re H Children)*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo. 2003). "The submission of ... a particular form of special verdict is vested in the sound discretion of the trial court." *Turcq v. Shanahan*, 950 P.2d 47, 53 (Wyo.1997). We consider the verdict form together with the instructions provided to the jury. *Pauley v. Newman*, 2004 WY 76, ¶ 12, 92 P.3d 819, 824 (Wyo.2004). Reversal may only be predicated upon an abuse of the court's discretion. *Addakai v. Witt*, 2001 WY 85, ¶ 16, 31 P.3d 70, 73 (Wyo.2001).

> The core of our inquiry must reach 'the question of reasonableness of the choice made by the trial court.' *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998). 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' *Id.* (quoting *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236, 1238 (1985)); *Basolo [v. Basolo]*, 907 P.2d [348] at 353 [Wyo. 1995]. We must ask ourselves whether the district court could reasonably conclude as it did and whether any facet of its ruling was arbitrary or capricious.

*Young v. HAC, LLC*, 2001 WY 50, ¶ 6, 24 P.3d 1142, 1144 (Wyo.2001) (quoting *Carl-*

*ton v. Carlton*, 997 P.2d 1028, 1031 (Wyo. 2000)).

*Pauley*, ¶ 7, 92 P.3d at 822.

[¶ 29] In making its decision regarding which verdict form was most appropriate, the district court heard argument from all parties and considered the evidence presented during trial. The court noted that the evidence presented by all parties indicated that all parties were "interested in keeping the children together if possible." This conclusion was supported by the testimony at trial that both parents wanted all the children to be placed together. The district court reasoned that there was no specific evidence presented at trial that would justify treating one child differently from the others with regard to termination of Mother's parental rights. We agree. Although the jury heard testimony about each of the children, much of the evidence regarding Mother's fitness related to factors that would affect all children in the household, including Mother's ability to financially support the children, provide a safe environment for the children, identify when a child is experiencing mental distress or behaving inappropriately and communicating those issues to the child's therapist, follow through with the children's education, and provide appropriate supervision. Each of the four neglect petitions filed in juvenile court resulted in removal of all of the children from the home and all the children being placed in foster care. The court was clearly concerned about the confusion that may be caused by Mother's verdict form given the nature of the evidence presented during trial.

[¶ 30] Mother correctly contends that the law in Wyoming termination cases is that whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends on the situation and attributes of the specific parent and child. *AJJ*, ¶ 15, 242 P.3d at 971. The jury was appropriately instructed as to this law, through Jury Instruction No. 12:

> The term "unfit" is not defined in the termination of parental rights statutes. "Unfit" generally means unsuitable, incompetent or not adapted or qualified for a

particular use or service. Parental unfitness includes the inability to appreciate and perform the obligations required of a parent. Unfitness means the probability that the parent will fail in a substantial degree to discharge his or her parental duties towards a child. Unsuitability for any reason may render a parent unfit to have custody of their child. A failure to show a willingness to respond to the needs of a child may render a parent unfit. Fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child. **Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.** [Emphasis added.]

There is no indication the jury disregarded this instruction or any other instructions. Our review of the sufficiency of the evidence in the preceding section confirmed that there was clear and convincing evidence to establish that Mother was unfit as to each of her nine children.

[¶ 31] Reading the special verdict form together with Instruction No. 12, we cannot say that the form of the special verdict misled or confused the jury with respect to the applicable principles of law or was fundamentally unfair, and we find no abuse of discretion.

*Constitutionality of Termination Statute's Burden of Proof*

[¶ 32] Mother next asserts that her due process and equal protection rights under the United States and Wyoming constitutions were violated by the "clear and convincing" standard of proof set forth in § 14-2-309.[5] Mother's position is that the higher "beyond a reasonable doubt" standard should be required for termination cases. We review constitutional issues *de novo*. *Giles v. State*, 2004 WY 101, ¶ 10, 96 P.3d 1027, 1030 (Wyo.2004).

[¶ 33] Mother argues that the "clear and convincing" standard violates her due process rights. The United States Supreme Court addressed an argument like Mother's and concluded that the "clear and convincing" burden of proof "adequately conveys to the fact finder the level of subjective certainty about [the] factual conclusions necessary to satisfy due process." *Santosky v. Kramer*, 455 U.S. 745, 768–69, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982). The Court did not foreclose states from setting a higher burden of proof in termination cases, but rather set a minimum burden of proof. *Id.* at 769–70, 102 S.Ct. at 1403 ("We further hold that determination of the precise burden equal to or greater than [the clear and convincing] standard is a matter of state law properly left to state legislatures and state courts."). The Wyoming legislature has set a burden of proof in termination of parental rights cases to require clear and convincing evidence. § 14-2-309(a). The United States Supreme Court has determined this standard to be constitutionally sufficient, and Mother offers no pertinent legal authority or cogent argument to support her assertion that a higher burden of proof is necessary to protect a parent's due process rights in Wyoming. Mother's due process rights have not been violated by application of the clear and convincing standard of proof.

[¶ 34] Mother's second argument is that the "clear and convincing" proof standard violates her rights to equal protection because the federal Indian Child Welfare Act (ICWA), U.S.C. Title 25, Chapter 21, Section 1912(f), establishes a "beyond a reasonable doubt" standard of proof when the State seeks to terminate an Indian parent's parental rights. Mother argues that the equal protection violation arises because a different standard is applied to her (a non-Indian parent) than to Indian parents.

[¶ 35] The United States Supreme Court has not addressed the equal protection issue as it relates to the different burdens of proof in the federal ICWA and state termination of parental rights statutes. However, the

---

**5.** Mother provides no discernible state constitutional law argument in her brief; consequently, we will not consider any alleged violations of the Wyoming Constitution. *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 908 (Wyo.1992).

Court addressed a similar equal protection argument when considering the tax immunity provided to Indians living on reservations in Montana. *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). In *Moe,* the Court set forth its reasoning that special treatment towards Indians does not violate equal protection:

> Literally every piece of legislation dealing with Indian tribes and reservations ... single[s] out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.

> On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment.

*Moe,* 425 U.S. at 480, 96 S.Ct. at 1644 (quoting *Morton v. Mancari,* 417 U.S. 535, 552–55, 94 S.Ct. 2474, 2483–85, 41 L.Ed.2d 290 (1974)). The Court determined that these kinds of statutory preferences are neither "invidious" nor "racial" in character and applied the following test to determine whether an equal protection violation exists: "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* (quoting *Morton,* 417 U.S. at 554–55, 94 S.Ct. at 2485).

[¶ 36] Several state courts have evaluated the equal protection argument in the context of the ICWA as compared with a state statute with a "clear and convincing" standard of proof. *See, In re Application of Angus,* 60 Or.App. 546, 655 P.2d 208 (1982), *Knight v. State (In re M.K.),* 964 P.2d 241 (Okla.Civ. App.1998); *State v. Sonya L. (In re Phoenix L.),* 270 Neb.870, 708 N.W.2d 786 (2006). Those courts have applied the test articulated in *Moe* and concluded that there was no equal protection violation under the United States Constitution. *See, e.g., Application of Angus,* 655 P.2d at 213 (holding "the protection of the integrity of Indian families to be a permissible goal that is rationally tied to the fulfillment of Congress' unique guardianship obligation toward the Indians."). Mother provides no legal authority or cogent argument in support of her position that an equal protection violation has occurred. We follow the reasoning of the Oregon court in *Application of Angus* and hold that the different burdens of proof in the federal ICWA and Wyoming's termination statute do not violate Mother's constitutional right to equal protection under the law.

*Cumulative Errors*

[¶ 37] In her final issue, Mother argues that the termination proceedings were "replete with errors" and that the cumulative effect of these errors denies Mother's constitutional procedural and substantive due process rights under the Wyoming and United States constitutions. "The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." *Sweet v. State,* 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010). "When making this evaluation, we consider only matters that were determined to be errors and not any matter assigned as error but determined not to be erroneous." *Id.*

[¶ 38] Mother states, "There are far too many errors to list all individually in this limited Appellant's Brief.... Some examples are set out below, but by no means are exhaustive within the voluminous record." In addition to the issues previously discussed, Mother in essence claims that virtually every ruling adverse to her that the district court made on the pleadings, in the hearings, and at trial was in error—motions denied, objections overruled, exhibits not allowed, and impermissible hearsay allowed. Such blanket assertions are far too vague for us to meaningfully review. Mother also assigns error to case management orders concerning experts, discovery, and the trial schedule; the court's handling of a potential juror conflict that arose during trial; and

DFS' refusal to consider foster care placement with relatives. We have considered Mother's other contentions. None are supported by legal authority or have sufficient merit to warrant further discussion. Finding no errors, we do not reach the issue of cumulative error.

### CONCLUSION

[¶ 39] We have applied our strict scrutiny standard of review to this termination proceeding and find no reversible error. The district court's order terminating Mother's parental rights to her nine children pursuant to § 14-2-309(a)(v) was supported by clear and convincing evidence. The special verdict form given to the jury was appropriate, and the district court did not abuse its discretion in refusing Mother's special verdict form. The district court's use of the "clear and convincing" standard of proof comported with constitutional law principles and did not violate Mother's due process or equal protection rights. Finally, finding no errors by the district court, we do not reach the question of cumulative error. Affirmed.

See also, 280 P.3d 1203.